Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-1000

James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Counsel for Plaintiffs and the Proposed Classes*

(additional counsel on signature page)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LINDA BLACKWELL, SIRO BRENES, CARL CLARK, KEITH COLWELL, AMIR CRAWFORD, LEVANDA GAYDEN, ANDREA GEOLY, TERESA ISOM, MUHAMMED JACKSON, MERISSA JONES, KRISHNAKAT KHETAN, VALERIU MATEI, ENRIQUE PEREZ, KIA WATSON, AND LEWIS YOUNG, individually and on behalf of all others similarly situated, | Civil Action No. 3:22-cv-05502-ZNQ-DEA **CONSOLIDATED CLASS ACTION COMPLAINT** |
| PLAINTIFFS, | |
| v. | |
| MERCEDES-BENZ USA, LLC AND MERCEDES-BENZ GROUP AG f/k/a DAIMLER AG | |
| DEFENDANTS. | |

Plaintiffs Linda Blackwell, Siro Brenes, Carl Clark, Keith Colwell, Amir Crawford, Levanda Gayden, Andrea Geoly, Teresa Isom, Muhammed Jackson, Merissa Jones, Krishnakat Khetan, Valeriu Matei, Enrique Perez, Kia Watson, and Lewis Young (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class Members"), allege the following against defendants Mercedes-Benz USA, LLC ("MBUSA") and Mercedes-Benz Group AG f/k/a Daimler ("MBG") (and, together with MBUSA, "Mercedes" or "Defendants"). The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.

## I.      INTRODUCTION

1.      This lawsuit arises out of a defect that causes the battery in Mercedes vehicles to drain rapidly and unexpectedly (the "Electrical Drain Defect" or "Defect").

2.      The Defect is inherent in the common electrical system used across a broad swath of Mercedes vehicles ("Affected Vehicles") manufactured between 2004 and 2022, including but not limited to Mercedes Class S, C, A, CLA, CLS, G, GLA, GLK, GLC, ML, GLE, GL, GLS, and E. In contrast to the premier product Mercedes markets, and the public and Class Members expect, the Electric Drain Defect makes the Affected Vehicles unreliable, unsafe and undesirable.

3.      A vehicle's battery is the cornerstone to its safety and reliability.  The battery provides the only source of power to first start the vehicle after being turned off, and when off, maintains a vast array of electronic and electrical components which ensure the safety and reliability of the vehicle.  When a battery is dead or compromised, so too is the vehicle.

4.      In all Affected Vehicles, the Electrical Drain Defect compromises the health and integrity of the vehicle's battery and causes the battery to suddenly drain, preventing the car from starting, potentially stranding the occupants and endangering their safety. The Defect can also

cause vehicle performance to suffer, including the performance of electrical safety systems and features that are used by Defendants to justify the substantial price charged for their vehicles.

5.     Based on its repeatedly failed efforts to address the Electrical Drain Defect, customer complaints, repair data, and other internal sources, Mercedes knew or should have known about the existence of the Electrical Drain Defect and its consequences.  Indeed, Mercedes had undertaken sufficient investigation of and engagement with the Defect to refer to it as a "known issue."

6.     Nevertheless, Mercedes has never disclosed, and has actively concealed, the presence of the Electrical Drain Defect in the Affected Vehicles, and continued to market its vehicles as safe and reliable, even while adding more electronic and electrical features to its vehicles, leaving purchasers to carry the costs of dealing with the Defect.

7.     Mercedes has likewise never offered to repair the Electrical Drain Defect or otherwise compensate Class Members for their injuries resulting from the defect which it has not repaired. Rather, Mercedes has taken half-measures which may cover-up but do not address the underlying Electric Drain Defect or otherwise provide the vehicles Class Members were deceived into purchasing and for which, as a result of the defect, they over paid.

8.     As a result of Mercedes' misconduct, Plaintiffs and other Class Members were harmed and suffered actual damages in the form of overpayment for their vehicles, diminished value, and expenses related to the undisclosed Electrical Drain Defect which Mercedes has failed to rectify.

## II.   PARTIES

**A.   Plaintiffs**

9.      Plaintiffs and each and every Class Member have suffered an ascertainable loss as a result of Mercedes' omissions and misrepresentations regarding the Affected Vehicles, included but not limited to out-of-pocket loss and the diminished value of the Affected Vehicles.

10.      Neither Mercedes nor any of its agents, dealers, or other representatives informed Plaintiffs or Class Members of the Electrical Drain Defect prior to purchase.

11.      Plaintiffs received information about the characteristics, benefits, safety, and quality of the Affected Vehicles at the dealership and/or through Mercedes' extensive advertising concerning quality and safety, as intended by Mercedes. None of the information Plaintiffs received disclosed the Electrical Drain Defect prior to the vehicle's purchase.

12.      The Plaintiffs appear in the following chart, with more detailed descriptions below:

| Representative Plaintiff | Model | Year | State |
|---|---|---|---|
| Linda Blackwell | GLA-250 | 2017 | California |
| Siro Brenes | ML-350 4Matic | 2013 | New York |
| Carl Clark | Gl-450 | 2012 | Ohio |
| Keith Colwell | GLK-350 | 2015 | Texas |
| Amir Crawford | CLS-450 | 2019 | New Jersey |
| Levanda Gayden | S-550 | 2013 | Missouri |
| Andrea Geoly | GLK-350 | 2010 | Pennsylvania |
| Teresa Isom | S-500 | 2010 | California |
| Muhammed Jackson | C-300 - 4Matic | 2010 | Minnesota |
| Merissa Jones | C-300 | 2008 | New Jersey |

| Representative Plaintiff | Model | Year | State |
|---|---|---|---|
| Krishnakat Khetan | C-320 | 2004 | Virginia |
| Valeriu Matei | E-320 | 2004 | California |
| Enrique Perez | S-550 | 2007 | New Jersey |
| Kia Watson | C-300 | 2009 | Illinois |
| Lewis Young | S-500 | 2004 | New Jersey |

*Plaintiff Blackwell*

13.     Plaintiff Linda Blackwell is a resident of Sacramento, California. In about 2021, Ms. Blackwell bought a 2017 GLA-250 Mercedes from Mercedes-Benz of Sacramento in Sacramento, California.

14.     Since Ms. Blackwell purchased her Affected Vehicle, the battery has frequently unexpectedly drained, including multiple times away from her home. As a result, she has had to replace the battery twice before the end of the expected life of the batteries since purchasing the car.

15.     Ms. Blackwell has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

16.     Mercedes never disclosed the Defect to Ms. Blackwell before she purchased the Affected Vehicle, so she purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. She reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price she paid had she been aware of the Defect.

*Plaintiff Brenes*

17.     Plaintiff Siro Brenes is a resident of Freeport, New York. In about 2013, Mr. Brenes bought a 2009 ML-350 4Matic Mercedes from Ofier Auto Sales in Freeport, New York.

5

18.     Since Mr. Brenes purchased his Affected Vehicle, the battery has frequently unexpectedly drained, including away from his home, requiring him to replace the battery twice before the expected life of the batteries since purchasing the car.

19.     Mr. Brenes has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

20.     Mercedes never disclosed the Defect to Mr. Brenes before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

*Plaintiff Clark*

21.     Plaintiff Carl Clark is a resident of Shaker Heights, Ohio. In about 2019, Mr. Clark bought a 2012 GL-450 Mercedes from Northeast Auto Gallery in Bedford, Ohio.

22.     Since Mr. Clark purchased his Affected Vehicle, the battery has frequently unexpectedly drained, and the vehicle has often had trouble starting as a result.

23.     Mr. Clark has incurred expenses associated with the Defect.

24.     Mercedes never disclosed the Defect to Mr. Clark before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

*Plaintiff Colwell*

25.     Plaintiff Keith Colwell is a resident of Dallas, Texas. Mr. Colwell bought a 2015 GLK-350 Mercedes from Park Place Volvo in Dallas, Texas.

6

26.     Since Mr. Colwell purchased his Affected Vehicles, the batteries have frequently unexpectedly drained, requiring him to replace the batteries multiple times before the end of the useful life of the batteries since purchasing the car.

27.     Mr. Colwell has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

28.     Mercedes never disclosed the Defect to Mr. Colwell before he purchased the Affected Vehicles, so he purchased them on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicles were without defect, and would not have bought them at the price he paid had he been aware of the Defect.

*Plaintiff Crawford*

29.     Plaintiff Amir Crawford is a resident of Plainfield, New Jersey. In about 2019, Mr. Crawford bought a 2019 CLS-450 Coupe from Ray Catena Mercedes-Benz in Union, New Jersey.

30.     Since Mr. Crawford purchased his Affected Vehicle, its battery has frequently and unexpectedly drained, requiring him to replace the battery twice before the end of the expected life of the batteries since purchasing the car, including two batteries in 2022.

31.     Mr. Crawford has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

32.     Mercedes never disclosed the Defect to Mr. Crawford before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

*Plaintiff Gayden*

33.    Plaintiff Levanda Gayden is a resident of Kansas City, Missouri. In about 2020, Mr. Gayden bought a 2013 S-550 Mercedes from Road Star Motors in Independence, Missouri.

34.    Since Mr. Gayden purchased his Affected Vehicle, the battery has frequently unexpectedly drained, requiring him to replace the battery twice before the end of the expected life of the batteries since purchasing the car.

35.    Mr. Gayden has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

36.    Mercedes never disclosed the Defect to Mr. Gayden before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

*Plaintiff Geoly*

37.    Plaintiff Andrea Geoly is a resident of Hawley, Pennsylvania. In about 2018, Ms. Geoly bought a 2010 GLK-350 Mercedes from Small Town Auto Sale in Hazleton, Pennsylvania.

38.    Since Ms. Geoly purchased her Affected Vehicle, the battery has frequently unexpectedly drained, including away from her home, requiring her to replace the battery before the end of the expected useful life since purchasing the car.

39.    Ms. Geoly has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

40.    Mercedes never disclosed the Defect to Ms. Geoly before she purchased the Affected Vehicle, so she purchased it on the reasonable, but mistaken, belief that the electrical

system was reliable. She reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price she paid had she been aware of the Defect.

*Plaintiff Isom*

41.    Plaintiff Teresa Isom is a resident of Palm Springs, California. In about 2020, Ms. Isom bought a 2010 S-500 Mercedes from A-1 Cars & Truck in North Highlands, California.

42.    After Ms. Isom purchased her Affected Vehicle, the battery has frequently unexpectedly drained, including multiple times away from her home. As a result, she has had to replace the battery twice before the end of the expected life of the batteries since purchasing the car.

43.    Ms. Isom has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

44.    Mercedes never disclosed the Defect to Ms. Isom before she purchased the Affected Vehicle, so she purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. She reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price she paid had she been aware of the Defect.

*Plaintiff Jackson*

45.    Plaintiff Muhammed Jackson is a resident of St. Paul, Minnesota. In about 2017, Mr. Jackson bought a 2010 C-300 4Matic Mercedes from Autos Online in Fridley, Minnesota.

46.    Since Mr. Jackson purchased his Affected Vehicle, the battery has frequently unexpectedly drained, including away from his home. As a result, he has had to replace the battery multiple times before the end of the expected life of the batteries since purchasing the car.

47.     Mr. Jackson has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries. Eventually, the problem became so severe that Mr. Jackson could only start the car with a jump start, at which point he stopped using the vehicle entirely.

48.     Mercedes never disclosed the Defect to Mr. Jackson before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

*Plaintiff Jones*

49.     Plaintiff Merissa Jones is a resident of Toms River, New Jersey. In about 2012, Ms. Jones bought a 2008 C-300 Mercedes from Mercedes-Benz Edison in Edison, New Jersey.

50.     Since Ms. Jones purchased her Affected Vehicle, the battery has frequently unexpectedly drained, requiring her to replace the battery three times before the end of the expected life of the batteries since purchasing the car.

51.     Ms. Jones has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

52.     Mercedes never disclosed the Defect to Ms. Jones before she purchased the Affected Vehicle, so she purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. She reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price she paid had she been aware of the Defect.

*Plaintiff Khetan*

53.     Plaintiff Krishnakant Khetan is a resident of Edison, New Jersey. In about 2008, Mr. Khetan bought a 2004 C-320 Mercedes from Mercedes-Benz of Arlington in Arlington, Virginia.

54.     Since Mr. Khetan purchased his Affected Vehicle, its battery has unexpectedly drained twice, requiring him to replace the battery at least five times before the end of the expected life of the batteries since purchasing the car.

55.     Mr. Khetan has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries, and since his vehicle permanently stopped working, he has been let without the use of his own vehicle.

56.     Mercedes never disclosed the Defect to Mr. Khetan before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

*Plaintiff Matei*

57.     Plaintiff Valeriu Matei is a resident of Palm Springs, California. In about 2018, Mr. Matei bought a 2004 E-320 Mercedes from Mission Car Company in Palm Desert, California.

58.     Since Mr. Matei purchased his Affected Vehicle, the battery has frequently unexpectedly drained, requiring him to replace the battery three times before the end of the expected life of the batteries since purchasing the car.

59.     Mr. Matei has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

60.     Mercedes never disclosed the Defect to Mr. Matei before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

*Plaintiff Perez*

61.     Plaintiff Enrique Perez is a resident of Savannah, Georgia. In about 2015, Mr. Perez bought a 2007 S-550 Mercedes from Benzel-Busch Motor Car in Englewood, New Jersey.

62.     Since Mr. Perez purchased his Affected Vehicle, its battery has unexpectedly drained twice, and before the end of expected life of the battery, requiring him to contract a towing company, leaving his Affected Vehicle at a mechanic, and renting a replacement vehicle while the Affected Vehicle was repaired. Approximately six months prior to the filing of this complaint, the battery unexpectedly drained a third time, and Mr. Perez has been unable to use the car since.

63.     Mr. Perez has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

64.     Mercedes never disclosed the Defect to Mr. Perez before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

*Plaintiff Watson*

65.     Plaintiff Kia Watson is a resident of Chicago, Illinois. In about 2020, Ms. Watson bought a 2009 C-300 Mercedes from a private party in Illinois.

66.     Since Ms. Watson purchased her Affected Vehicle, the battery has frequently unexpectedly drained, including multiple times away from her home. As a result, she has had to replace the battery twice before the end of the expected life of the batteries since purchasing the car. The problems with her battery are so severe that she no longer drives the vehicle.

67.     Ms. Watson has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

68.     Mercedes never disclosed the Defect to Ms. Watson before she purchased the Affected Vehicle, so she purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. She reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price she paid had she been aware of the Defect.

*Plaintiff Young*

69.     Plaintiff Lewis Young is a resident of Pine Hill, Camden County, New Jersey. In about 2020, Mr. Young bought a 2004 S-500 Mercedes from a private party in New Jersey.

70.     Since Mr. Young purchased his Affected Vehicle, the battery has frequently unexpectedly drained, requiring him to replace the battery four times before the end of the expected life of the batteries since purchasing the car.

71.     Mr. Young has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries.

72.     Mercedes never disclosed the Defect to Mr. Young before he purchased the Affected Vehicle, so he purchased it on the reasonable, but mistaken, belief that the electrical system was reliable. He reasonably expected that the Affected Vehicle was without defect, and would not have bought it at the price he paid had he been aware of the Defect.

**B.     Defendants**

**Defendant Mercedes-Benz USA, LLC**

73.     Defendant Mercedes-Benz USA, LLC ("MBUSA") is a Delaware corporation headquartered in Atlanta, Georgia. Its registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

74.     Until approximately July 2015, and during the most of the class period, MBUSA's principal place of business was in Montvale, New Jersey.

75.     Until moving its headquarters to Georgia in 2015, MBUSA directed and engaged in the business of designing, manufacturing, marketing, warranting, distributing, selling, leasing, and servicing vehicles, including the Affected Vehicles, from its headquarters in Montvale, New Jersey.

76.     MBUSA's NJ Northeast Region Office, which is responsible for advertising, sales, and marketing for dealers in the Northeast and parts of the Midwest, is currently located in Montvale, New Jersey.

77.     At all relevant times, direction, planning and execution of decisions relating to the advertising, sales, and marketing of the Affected Vehicles, including decisions to misrepresent or conceal the Electrical Drain Defect, took place in MBUSA's NJ Northeast Region Office.

78.     MBSUA also operates its Northeast Learning and Performance Center, which is a training facility for dealership and MBUSA personnel in the Northeast region, in Robbinsville, New Jersey.

79.     At all relevant times, MBUSA trained its dealership and corporate personnel regarding the sale and marketing of the Affected Vehicles, including how to misrepresent or conceal the Electrical Drain Defect, in MBUSA's Northeast Learning and Performance Center in Robbinsville, New Jersey.

80.     MBUSA also operates its NJ Regional Master Parts Distribution Center, which supplies parts and houses inventory for dealers for the entire Northeast region, in Robbinsville, New Jersey.

81.     At all relevant times, MBUSA housed and distributed inventory containing the Defect from its NJ Regional Master Parts Distribution Center in Robbinsville, New Jersey.

82.     Throughout the class period, MBUSA also distributed inventory containing the Defect to independent dealerships in New Jersey.

83.     MBUSA is a wholly owned subsidiary of MBG.

84.     At all relevant times, MBUSA has been an agent of MBG and subject to its control.

**Defendant Mercedes-Benz Group AG f/k/a Daimler**

85.     Defendant Mercedes-Benz Group AG f/k/a Daimler ("MBG," and, collectively with MBUSA, "Mercedes" or "Defendants") is a German Corporation with its principal place of business in Stuttgart, Germany.

86.     At all relevant times, MBG engaged in the business of designing, engineering, manufacturing, testing, marketing, supplying, selling, and distributing motor vehicles, including the Affected Vehicles, in the United States.

87.     MBG engineered, designed, developed, manufactured, and installed the electrical systems in the Affected Vehicles, with knowledge of the Electrical Drain Defect, and exported those vehicles to the United States with the knowledge and understanding that they would be sold throughout the United States.

88.     At all relevant times, MBG did business in a continuous manner through a chain of distribution throughout the United States, including in the District of New Jersey and the State of New Jersey, by selling, advertising, promoting, and distributing vehicles under the Mercedes mark.

89.     Through its wholly-owned subsidiaries and/or agents, including MBUSA, MBG markets its products in a continuous manner in the United States, including in the State of New Jersey.

90.     MBG is the parent of, and controls and communicates with, MBUSA, including in all aspects of the Affected Vehicles distributed in the United States.

91.     MBUSA acts as the sole distributor for Mercedes vehicles in the United States, purchasing those vehicles from MBG in Germany for sale in this country.

92.     MBG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Affected Vehicles.

93.     Upon information and belief, the relationship between MBG and MBUSA is governed by a General Distributor Agreement that gives MBG the right to control nearly every aspect of MBUSA's operations, including sales, marketing, management policies, information governance policies, pricing, and warranty terms.

94.     MBG owns 100% of the capital share in MBUSA.

95.     MBG paid 19 million euros (then worth approximately 21.8 million U.S. dollars) in relocation expenses when it moved MBUSA's headquarters from New Jersey to Atlanta.

96.     MBG and MBUSA hold themselves out collectively as "Mercedes." In consumer-facing material in the United States, MBG does not draw a distinction between itself and MBUSA, instead representing MBUSA as MBG's United States presence as "Mercedes," for the purpose of selling and leasing vehicles bearing the Mercedes-Benz mark.

97.     Plaintiffs and other Class Members justifiably relied on MBUSA's representations, actions, and omissions regarding the Affected Vehicles that were the responsibility of MBG, and suffered injuries as a result of their reliance on those representations.

98.     Service of process on this defendant is proper by serving it via its wholly owned subsidiary and alter ego, MBUSA.

### III.     JURISDICTION

99.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from

16

one Defendant, there are more than 100 Class Members nationwide, and the aggregate  amount in controversy exceeds $5,000,000 and minimal diversity exists. This Court also has  supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

100.    This Court has personal jurisdiction over Defendants because, for the majority of the relevant time period, MBUSA maintained its headquarters in this District through which MBG conducted its business in the United States, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. Both MBUSA and MBG have purposefully availed themselves of the privileges, benefits, and protections of this District by continuously and systematically conducting substantial business in this District.

101.    A substantial part of the direction, planning and execution of decisions relating to the advertising, sales, and marketing of the Affected Vehicles, including decisions to misrepresent or conceal the Electrical Drain Defect, took place in MBUSA's NJ Northeast Region Office.

102.    Mercedes trained its dealership and corporate personnel from around the Northeast region in techniques for selling and marketing the Affected Vehicles, including how to misrepresent or conceal the Electrical Drain Defect, in MBUSA's Northeast Learning and Performance Center in Robbinsville, New Jersey.

103.    Mercedes shipped a substantial number of the Affected Vehicles containing the Defect through its Regional Master Parts Distribution Center in Robbinsville, New Jersey, before distributing them throughout the United States for sale.

104.    MBG, itself and/or through its subsidiaries or agents including MBUSA, shipped vehicles to the United States, with the intention and knowledge that they would be sold to consumers in New Jersey.

17

105.     Mercedes contracted with licensed independent Mercedes dealers in New Jersey, with the intention and knowledge that Affected Vehicles containing the defect would be sold to consumers, including named Plaintiffs and other members of the New Jersey Subclass, in New Jersey.

106.     Mercedes maintains an interactive website that is accessible in New Jersey and from which it solicits business in New Jersey, and markets its brand and products in New Jersey.

107.     Mercedes disseminated statements and marketing materials that omitted material facts, made material misrepresentations and/or misleading statements, which damaged Plaintiffs and Class Members in New Jersey and elsewhere, as alleged herein.

## IV.     VENUE

108.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part  of the events or omissions giving rise to the claims occurred in this District, where MBUSA was headquartered in this district for the majority of the relevant time period. Mercedes also authorizes dealers in this District, advertises in this District, and profits from its activities conducted within this District.

## V.     FACTUAL ALLEGATIONS

### A.     The Defective Electrical System

109.     A typical automotive electrical system is made up of a 12-volt battery, a starter, and an alternator. The battery powers the starter which, in turn, starts the engine. Once the engine is started, the alternator provides power to the vehicle and recharges the battery.

110.     The battery is also the source of electricity for all electrical and electronic components of the vehicle.  Particularly with vehicles like the premier Affected Vehicles designed, manufactured and sold by Defendants, the number and kind of electrical and electronic components included in the vehicles increases the demands on the battery.  Such features are wide

ranging and include basic functions like airbags, headlights, and other safety systems, and also include such conveniences as entertainment systems and related settings, pairing information for Bluetooth devices, navigation systems and related settings, seat position setting, remote starting options, and, more recently, functions like app telemetry, Me Connect ®, mbrace® and WiFi. Each and every one of these features will draw energy from the battery to ensure functionality when the engine is not running.

111.   Because the battery maintains full and proper operation of a vehicle, including the fundamental function of starting the vehicle, electronic and electrical components in a vehicle must operate within narrow specifications of current draw when a vehicle is turned off and the battery is the sole source of power.  When operating within specification, the expected "quiescent current" draw will ensure that the battery maintains proper operational health and longevity.   When such specifications are exceeded, and the battery is beset by "excessive parasitic drain," the battery is compromised, will be unable to start the car when not regularly used after short intervals, and its expected useful life will be shortened.

112.   The battery ensures power specifications through complex computer systems linked by a control area network (also known as a "CAN" or "CAN bus") which act as a central hub that controls the various electronic components of the vehicle.  The CAN ensures that those components that need to enter a "sleep mode" to maintain a base level of operation (at a lower drain) do so, and those that can simply be turned off (to drain no power) do so when the vehicle is turned off.

113.   As a result of the Electric Drain Defect, the CAN remains fully active even when the vehicle is turned off, and fails in this critical function.  Components that are to be powered down to draw less or no power fail to do so and remain fully operational even when the vehicle is

turned off. Depending on the level of excessive parasitic drain caused by the Electric Drain Defect, the battery can be swiftly drained in a matter of hours or will be subject to ongoing, excessive burdens that lead to premature battery failure.  Mercedes has many terms of art it has used internally to refer to this - such as "CAN bus awake," "CAN awake unusually long," "bus keepawake control unit," and "bus keepawake event" – but the Defect and consequences are the same.

114.    The Electrical Drain Defect causes the 12-volt battery in Mercedes vehicles to drain unexpectedly while the car is parked. Once the battery is drained, the starter does not have sufficient power to operate, making the vehicle impossible to start using the ignition and denying the vehicle sufficient energy to operate any of the electrical components.

115.    Recent Mercedes models contain 48-volt batteries that help to power the vehicle alongside the traditional internal combustion engine. The intent of this hybrid design is to increase fuel efficiency. Because the vehicle relies on the battery for power, however, if the battery fails mid-operation, the vehicle's performance suffers and its engine can overheat.

116.    The 48-volt batteries are equally vulnerable to the Electrical Drain Defect, and their failure poses even greater problems. Adding to the inability to start and operate basic electrical components while the car is not on, the Electrical Drain Defect impacts the performance of hybrid vehicles even when on and in operation.

117.    As a result, Affected Vehicles that contain a 48-volt battery are susceptible to a sudden drain of either or both of their 12 or 48-volt battery, causing the car to either fail to start or its performance to suffer mid-operation.

**B.      Mercedes knew or should have known about the Electrical Drain Defect.**

118.    Mercedes knew or should have known of the Electrical Drain Defect before Plaintiffs purchased their Affected Vehicles. While Plaintiffs cannot know the extent of Mercedes' internal design and testing process absent discovery, it is evident from what is now publicly available, as well as the quality controls and monitoring that manufacturers like Mercedes undertake, that Mercedes was or should have been aware of the Defect.

119.    For instance, owners of the Affected Vehicles registered complaints consistent with the Electrical Drain Defect to the National Highway Traffic Safety Administration ("NHTSA").

120.    Owners of the Affected Vehicles also made complaints consistent with the Defect in public posts on online *fora*.

121.    As much as such complaints were mounting, Mercedes would be receiving its own complaints from customers, and seen trends relating to and information about the Electrical Drain Defect from its dealerships. It is likewise apparent that Mercedes was aware of the Defect because technical service bulletins, issued by Mercedes-authorized mechanics in response to problems they encounter, detail various encounters with the Defect.

122.    Plaintiffs also anticipate that discovery will reveal that Mercedes became aware of the Electrical Drain Defect through information it learned during the process of designing, manufacturing, and testing the Affected Vehicles which would have exposed the existence of the defect.

**C.      Mercedes knew or should have known about the Electrical Drain Defect through consumer complaints to NHTSA**

123.    NHTSA's Office of Defect Investigation allows consumers to submit complaints about vehicles directly to the agency, which it maintains in central databases.

124.    Mercedes, in the course of its duty to identify potential defects in its vehicles, regularly monitors consumer complaints to NHTSA about its vehicles.

125.    Throughout the Class Period, consumers regularly and consistently registered complaints with NHTSA that are consistent with the Electrical Drain Defect, including reports during the first years of ownership.

126.    Through its monitoring of complaints to NHTSA, Mercedes was or should have become aware of the Defect, particularly as battery failure in new vehicles is a point of significant concern for owners and automotive manufacturers alike.

127.    The volume of complaints to NHTSA regarding the Affected Vehicles demonstrates the scope and impact of the Defect. The following is an illustrative list of reports from the past few years related to new Mercedes vehicles suffering from the defect.

128.    NHTSA ID Number: 11282140

Incident Date: November 23, 2019
Consumer Location: Parker, CO
Vehicle Identification Number : WDDWF4KB2HR****

Summary of complaint: The 2017 Mercedes-Benz c300 vehicle suffered a complete loss of power/electrics while in motion at speed and in traffic, causing the vehicle to unexpectedly stop on two separate occasions. the loss of all electrical supply leaves the vehicle immobile, without warning indicators and cannot be moved. The first incident was around 5pm in a busy road junction in the dark, with limited lighting. as the vehicle is black colored it is difficult to see in these circumstances. The second incident was at another busy road junction in heavy traffic, at midday on a saturday. On both occasions the police had to attend as the immobilized vehicle posed a serious hazard with a risk of causing a collision to other road users. The approximate times to get the vehicle removed from the road in these two incidents were between 45 - 60 minutes. The period between the two incidents was 11 days. The day following then first incident, the vehicle was inspected by a Mercedes dealership, who had the vehicle in their possession for five days. Initially they stated that they had not found a cause for the loss of all electrical power in the vehicle. Subsequently when pressed on the matter, they stated the cause was a connection problem to the positive terminal on the battery. In good faith the vehicle was collected by me and driven without any apparent problem for four days, prior to the second incident. The mileage driven in that period was less

than 100 miles in total. This vehicle poses a serious risk to the driver, passengers and other road users.

129.    NHTSA ID Number: 11288497

Incident Date: December 3, 2019
Consumer Location: unknown
Vehicle Identification Number: WDD2J5JB2KA ****

Summary of Complaint: Driving on freeway at 75mph toward 202 w Arizona freeway, dashboard showed a "engine malfunction + 48 v battery see operator's manual:. 1 minute later another error on screen saying, coolant off turn engine off. Then the car lost the power in the middle lane off freeway. Luckily no cars behind us. Car in service at Cercedes dealer in Chandler AZ.

130.    NHTSA ID Number: 11352040

Incident Date: August 29, 2020
Consumer Location: Cary, NC
Vehicle Identification Number: 4JGFB5KB0LA ****

Summary of Complaint: Driving down the highway at 70 mph and '48v battery malfunction' warning goes off, along with a yellow check engine light. A few seconds later a 'coolant' error message pops up and a red check engine light comes on. Car looses power completely and I'm unable to accelerate at all. Call flashes a message of 'pull over and turn the engine off'. Fortunately no one was behind me and I was able to coast safely to the side of the highway before the car stalled completely. Found out through several blog posts multiple other 2020 GLE owners are having the same safety issue and there has been no recall by Mercedes-Benz and no resolution for the issue. Vehicles are spending months in the shop and eventually being bought back by the manufacturer or dealership. This is an incredibly dangerous issue to lose all power and control of the vehicles speed. I'm lucky no one was on the road near me when this happened, otherwise an accident almost surely would have occurred. Mercedes should be forced to address this safety issue immediately.

131.    NHTSA ID Number: 11424125

Incident Date: May 8, 2021
Consumer Location: Wilmington, MA
Vehicle Identification Number: 4JGFB5KE8MA ****

Summary of Complaint: The contact owns a 2021 Mercedes-Benz GLE450. The contact stated while driving at various speeds the vehicle loss motive power. The 48V battery malfunction and coolant hot turn-off vehicle message were displayed on the instrument panel. The battery indicator warning light was

illuminated. The vehicle was taken to the local dealer and diagnosed with a software issue. The contact was informed that the software needed to be updated. The vehicle was repaired however, the failure recurred. The manufacturer was not notified of the failure. The approximate failure mileage was 3,000.

132.    NHTSA ID Number: 11421337

Incident Date: June 15, 2021
Consumer Location: Barrington, IL
Vehicle Identification Number: 4JGFF5KE9LA ****

    Summary of Complaint: The vehicle issued a "48v battery malfunction" and the car warned me not to drive the vehicle under any circumstance. This was while driving at 55 mph on a country road. The dealer I bought the car from had 3 other cars brought in for the same issue. The dealer my car was towed to said they just had one with the same issue come in. Based on my reading, this is a serious issue and it appears that changing the battery does not correct the issue. I was transporting my entire family at the time. The thought of not being able to break when traveling at high speeds is terrifying. Seems to be a widespread issue on the newer cars. Mine is only a year old.

133.    NHTSA ID Number: 11427592

Incident Date: July 3, 2021
Consumer Location: Unknown
Vehicle Identification Number : W1K1J5JBXMF***

    Summary of Complaint: 48 Volt battery failed after three months and just 3,400 miles. I understand this to be a recurring problem with Mercedes. Car had to be towed as the vehicle was totally inoperable due to battery malfunction. It took more than three weeks for Mercedes to provide a replacement battery. From what I have read, there is a strong likelihood that the battery will fail again.

134.    NHTSA ID Number: 11440311

Incident Date: November 10, 2021
Consumer Location: Kenner, LA
Vehicle Identification Number: 4jgda5jb5ea ****

    Summary of Complaint: Instrument Cluster malfunction. Battery drained and replaced. 2.5 weeks later, the new battery drained. After the vehicle was jumpstarted, the instrument cluster remained on with SOS inoperable showing on the panel. The instrument cluster will not turn off, even after the vehicle has been turned off. So it continues to drain the battery. Mercedes has diagnosed the vehicle with a bad instrument cluster and says that it needs to be replaced. There were no

warning signs before the malfunction. I drove it and parked it. Then two days later the battery was dead. 10.19.21 - took vehicle to Mercedes for a regular schedule B service 10.21.21 - vehicle battery was dead after trying to crank it. 10.22.21 - Mercedes sent tow truck to bring it back to them. The battery was replaced on 10.25.21 and I picked up the vehicle. 11.10.21 - Vehicle NEW battery was dead again. Mercedes sent tow truck. The tow truck driver jumpstarted the vehicle and couldn't get the vehicle into neutral. Then the SOS inoperable message appeared. Vehicle was towed to Mercedes and diagnosed the next day (11.11.21) with a bad instrument cluster. Apparently there are no new instrument clusters available in the world, according to Mercedes, they are on backorder. And I cannot get a loaner vehicle. So they'd like for me to be without a vehicle for the foreseeable future.

135.    NHTSA ID Number: 11441783

Incident Date: November 20, 2021
Consumer Location: Livingston, NJ
Vehicle Identification Number: 4JGfb6bb0ma****

Summary of Complaint: GLE53 would not start. The car threw an error stating 12v battery malfunction.(Impacted the 48V battery) This essentially disables the vehicle completely. This is 2021 GLE53 with less than 5000 miles. There is also an issue with the side-view mirror and wind noise.

136.    In the course of exercising its duty to monitor reports to NHTSA, Mercedes was or should have become aware of the Electrical Drain Defect.

**D.    Mercedes knew or should have known about the Electrical Drain Defect through consumer complaints on online *fora***

137.    In addition to formal reports submitted to itself and to NHTSA, Mercedes was or should have been aware that many Affected Vehicle owners posted complaints about the Electrical Drain Defect on online *fora*, which were accessible to Mercedes. It is common practice for manufacturers to monitor such postings as part of regular quality control measures.

138.    For example, in a November 14, 2005 post on Benzforum.com ("Benzforum"), an online forum for Mercedes owners, a user described a battery drain issue with his new 2005 C240 vehicle:

> The servicing folks say that the battery died and that they tested for drainage over this weekend and everything looks good. They can't attribute a specific reason for the battery dying all of a sudden. They say that it is likely that the headlights were left in ON position instead of automatic! I can't believe a MB could have a battery drain for this reason 8O ...I've got a Honda Accord whose lights I leave on and they shut off automatically.

https://www.benzforum.com/threads/new-2005-c240-battery-died-one-fine-morning.11259/ (last accessed 8/25/2022).

139.    In a September 11, 2009 post, a Benzforum poster described the following problem:

> i replaced the rear consumer battery with a new one 3 months ago. i have just come back from a 2 month trip where the car was left garaged as normal with the alarm armed. it took half a day to recharge the rear battery through driving, not a battery charger. then all came on. now if i switch the car off it takes 15 mins every time to come back on! surely this is correctable?

https://www.benzforum.com/threads/sl500-consumer-electronics-warning.14774/ (last accessed 8/25/2022)

140.    In response, another poster responded "I leave the battery connected to a 'smart charger," and advised the original poster to do the same, and described a similar incident when he failed to connect the car to a smart charger and "the computer modules went into meltdown and I had to read and clear lots of DTC codes to get the car back to normal." *Id.*

141.    This prompted the original poster to respond "so your telling me its normal? surely not? thats a stunningly bad piece of design if it is? what do you think it is that drains the battery?" *Id.*

142.    In a December 14, 2014 Benzforum post, a user described the following problem:

> I own a 2003 E320...
> I have a draw on the main battery when the car is left off overnight (Car doors will not even open in morning). We got a replacement battery with no success. Alternator tested fine, Diagonostics were run by electrical shock and has 2.2 AMP draw. Car runs absolutely fine after recharged, the only thing i've noticed is that the window functions which allow the window to go up entirely with one click (rather than holding) is disabled.
> No mechanics thus far can figure out what specifically is draining the battery.

26

https://www.benzforum.com/threads/2003-mercedes-e320-drain-battery.26001/ (last accessed 8/25/2022)

143.    In a February 18, 2008 post on mercedesforum.com ("Mercedes Forum"), a poster described the following problem:

> I seem to have an issue with my battery draining if i leave my car for 2 days, it is drained absolutely flat and its a pig to get to the battery in the boot! anyone have similar issues. Obviously i have replaced battery and checked there is nothing left on i can see overnight!🙁

https://mercedesforum.com/forum/mercedes-s-class-11/battery-draining-27146/          (last accessed 8/25/2022).

144.    In response, one poster suggested a "faulty battery." *Id.* Another poster responded that he had "exactly the same issue with my local dealer." *Id.* He explained that, ordinarily, "I do all service / preventative maintenance work on the car myself it never goes near the dealer," but that he ultimately took his vehicle to the dealer after dealing with a similar persistent battery drain problem. As he described, the dealer worked with him through series of potential fixes without success. Afterwards, the dealer took the car overnight and presented it to him two days later, saying "'We have looked at the car and you will now find it OK Sir!'" *Id.* In response, the poster said, "I asked what had been found and they were very coy. I pushed more but got no answer. I've now run the car for a further week and several thousand mile and all is OK again. So what caused the problem and what did they do when they had the car back?" *Id.*

145.    In a January 3, 2011 Mercedes Forum post, a poster described the following problem:

> Last week, having used the key fob to lock the car, within three hours the battery was totally flat as the key fob wouldn't even unlock the doors.
>
> Connected a battery charger across the battery and the charger fuse blew. Disconnected the battery earth lead and then charged the battery. I got a BIG spark when I reconnected the lead and the car still wouldn't start

although the ignition would come on; also the radiator fan started to run (very strange).

I put an ammeter in series with the negative lead and the battery and with the car switched off and totally dead, the current drain was 18 Amps!!!!!

Now obviously something is wrong and the only things I can think of which handle that much current is the alternator or the starter motor.

Don't really have a clue how to go about isolating the problem. I can't start the car to take it to the garage because as soon as I connect the battery to the car, the voltage drops to around 11 volts just after the big spark.

I have tried another battery with identical results and current drain still in excess of 15 Amps.

https://mercedesforum.com/forum/mercedes-c-class-10/super-fast-battery-drain-c270-cdi-46319/ (last accessed 8/25/2022).

146.   The same poster later provided the following update:

Have put it into my local garage. They say the battery is completely knackered and are awaiting an electrician to come with the correct diagnosis software. Failing that it will be a tow to the local Merc garage and a remortgage, lol.

*Id.*

147.   In a May 23, 2019 Mercedes Forum post, a poster described the following problem: "So I have a bad battery drain, typically overnight. Fuses #3, 6, 9, 29, 31, 33, 34, 41, and 42 are drawing power after the car attempts to sleep!" https://mercedesforum.com/forum/mercedes-e-class-9/crazy-battery-drain-please-help-59556/ (last accessed 8/25/2022). Specifically, these fuses referred to the navigation system, the AGW, the overhead control panel, the steering column panel, the upper control panel, the central gateway control, and the driver side SAM control. *Id.*

148.   In a September 20, 2020 Mercedes Forum post, a poster described the following problem:

Battery drain is being caused by diagnostic circuit. Car shows no codes, and the drain is almost one amp. If the battery is left connected it will be completely drained over night. Other than checking the wiring to the

28

diagnostic receptacle, I don't know what else would cause this without showing a code.

https://mercedesforum.com/forum/mercedes-m-class-16/06-ml500-battery-drain-60609/ (last accessed 8/25/2022).

149.    In a January 26, 2007 post on Benzworld.org ("Benzworld"), a poster described the following problem:

> I noticed that my battery was drained when I could not start my car in the morning. I bought a brand new battery (hoping that the old one could not handle Chicago's tempretature). Same thing happened with the new battery - the third day I could not start the car in the morning.
> I got an ammeter and found out that the alternator charges the battery with 14.0V. Another test on engine off battery draw showed that after couple of minutes the draw drops to 0.5 amps and then to 0.10-0.15 amps. That clearly indicates that there is no excessive current draw.
> Why does the battery get drained over night?
> What else to check? and how?

https://www.benzworld.org/threads/mysterious-battery-drain.1301242/ (last accessed 8/25/2022).

150.    In a July 19, 2010 Benzworld post, a poster described the following problem:

> Something is draining my battery now. Used a portable battery to start the car and it continued to run when disconnected, so alternator is fine. Battery is 2 years old, but I will get it load tested tomorrow.

https://www.benzworld.org/threads/how-to-find-battery-drain.1532602/ (last accessed 8/25/2022)

151.    In response, another poster advised that "Most culprits are the central locking vacuum pump, electric antenna, aftermarket alarm and aftermarket stereo. Some people have had issues with aux fans stay running because the system was bypassed." *Id.*

152.    In a February 5, 2011 Benzworld post, a poster described the following problem:

> Battery very slowly goes down. Usually takes a week to completely drain if i dont use the car My drive to work each day is only about five minutes, was thinking that may have something to do with it. I have replaced battery and alternator, and it will usually last a couple years, then I have to recharge the battery fully, then it's good for another year or two then starts getting hard

to start again. I make enough long trips where battery should charge sufficiently, so not sure what's going on.

https://www.benzworld.org/threads/battery-drain-problem.1568818/ (last accessed 8/25/2022)

153.    Another poster responded with the following advice:

I had a very similar problem with mine a few years back, the battery always seeming to go much faster than it should even when replaced. The alternator was fine, the new batteries were fine and yet I was still having a dead or low battery every few months.

I asked around at the Mercedes dealership for a while and eventually found one of their mechanics who was cool enough to come out and electronically test each and every fuse port to see if there was any excess energy being drained/used than supposed to be. It turned out that the fuse point for the radio amplifier was drawing more power than it should, even when the radio was off. So when was turning the car off and leaving it be, the amplifier was still drawing and draining power from the battery without an active alternator to recharge the battery.

My options were to either try and replace the amplifier at a close to $1000 cost, or get in the habit of pulling the fuse for the amplifier that is in the trunk fuse box next to the battery.

*Id.*

**E.    Mercedes knew or should have known about the Electrical Drain Defect through the design and testing process**

154.    As a part of the standard process of design and manufacture of its vehicles, Mercedes would have—or reasonably should have—gained extensive and exclusive knowledge of the Affected Vehicles, including the existence of the Electrical Drain Defect.

155.    A manufacturer adhering to industry standards for design and testing would have implemented a sufficient design and testing process so that it would have detected the Electrical Drain Defect.

156.    Upon learning of the Defect, a manufacturer adhering to industry standards for design and testing would have taken steps to repair or mitigate the Defect.

30

157.     Mercedes also knew or should have known about the Electrical Drain Defect due to the high volume of complaints made by customers during the Affected Vehicles' warranty periods.

158.     Similarly, Mercedes knew or should have known about the Electrical Drain Defect through its replacement part data. Mercedes dealerships and authorized service centers order replacement parts directly through Mercedes.

159.     The abnormally high number of electrical system replacements and repairs would or should have notified Mercedes of a defect in the electrical systems.

160.     Mercedes also collects, reviews, and analyses data regarding all vehicle repairs made under warranty at its dealerships and service centers.

161.     This data is proprietary and Mercedes retains exclusive control of the data. As a result, Plaintiffs are unable to view the data before discovery. Plaintiffs reasonably believe that this data, when obtained through discovery, will show that Mercedes was or should have been aware of the Electrical Drain Defect.

162.     Due to these various internal reports, Mercedes was or should have been aware of the Electrical Drain Defect by 2003, at the latest.

**F.     Mercedes Ongoing Efforts to Address the Electrical Drain Defect Show Its Knowledge**

163.     All car manufacturers regularly issue Technical Service Bulletins ("TSB"s) in response to reports or discovery of problems in their vehicles. The TSBs are some of the most proactive countermeasures to a problem and are intended to help repair centers with common problems and to standardize repairs by describing problems with vehicles and prescribing specific repairs.

164.     NHTSA maintains a public database of all TSBs issued by major automobile manufacturers, including Mercedes.

165.    The high volume of TSBs addressing problems of prematurely drained batteries across various Mercedes models reflects the scope of the problem Mercedes faced, and its knowledge of the Electric Drain Defect. Indeed, these arise from a high volume of reported problems from dealers, repair centers, and consumers.

166.    For example, the July 12, 2013 TSB LI82.95-P-056655, entitled "Battery drain bus keepawake detected - mbrace control unit causes bus keepawake," describes how a "Customer experiences low battery conditions, resulting in jump starts, and eventually requiring battery replacement." It advises that the "PASS (mbrace) is programmed to update its Preferred Roaming List (PRL) every 90 days," and in some cases "will start attempting to update, even though no network is detected," which will ultimately "keep the CAN Bus awake, and . . . drain the battery."

167.    The October 27, 2017 TSB LI54.10-P-066344, entitled "Vehicle Does Not Start, Battery Discharged," advises that the onboard electrical system can continue operate when the engine is off, draining the battery, in which case the engine light will display the message "Interior CAN awake unusually long."

168.    The March 13, 2017 TSB LI82.85-P-066086, entitled "Discharge Starter Battery Because Of Excessively High Quiescent Current," describes how "the HERMES communication module (N112/9) may keep the CAN awake through the Bluetooth connection to the head unit," which "can discharge the starter battery" and result in the "[e]ngine start not [being] possible because battery voltage too low."

169.    The May 10, 2018 TSB LI54.10-P-066942, entitled "Discharged battery; vehicle does not start!! Model series 177 only!!" requests to "create a PTSS case for all 177 vehicles found with a discharged battery and no start condition," and lists the cause of the failure as "under analysis."

170.    The August 10, 2020 TSB LI54.10-P-071596, entitled "Vehicle does not start / Vehicle cannot be unlocked - starter battery may be discharged," describes how a vehicle cannot start or be unlocked, while displaying the message "Battery - Start Engine - see Operator's Manual." It describes an analysis showing event code U116000, detecting "a bus keepawake control unit . . . in the electronic ignition switch control unit."

171.    The March 16, 2021 TSB LI54.10-P-064762, entitled "Battery Discharged, Vehicle Does Not Start - Event Code U116000 A Bus Keepawake Event Has Been Detected Is Logged In The Quick Test," describes how the "[b]attery discharged, vehicle does not start," while displaying "event code U116000 'A bus keepawake event has been detected." The TSB advises that this may be caused by the electronic ignition lock control unit crashing, the Keyless-Go control unit crashing, the or the electronic ignition lock unit causing a "bus keepawake event."

172.    The April 21, 2021 TSB LI54.10-P-069698, entitled "Functional impairment of 48 V on-board electrical system," describes various associated problems, including "No start; Yellow or red instrument cluster message for 48 V on-board electrical system battery (G1/3); Limp home mode, overheating, A/C not blowing cold, or loss of acceleration." It advises only that "[v]arious causes are possible."

173.    As is a matter of course, TSBs are not the only countermeasure to be taken by manufactures, like Mercedes, to address a defect like an Electric Drain Defect. Often, countermeasures are considered and taken outside of TSBs. Given the foregoing complaints to NHTSA, the TSBs implemented by Mercedes, and the following facts, Plaintiffs understand that Mercedes also took such countermeasures, but never succeeded in remediating the Electrical Drain Defect.

## G.    Applicable Warranties

174.    Mercedes sold the Affected Vehicles with a "New Vehicle Limited Warranty," which includes protections against any "defects in material or workmanship":

> Mercedes-Benz USA, LLC (MBUSA) warrants to the original and each subsequent owner of a new Mercedes-Benz vehicle that any authorized Mercedes-Benz Dealership will make any repairs or replacements necessary, to correct defects in material or workmanship, but not design, arising during the warranty period . . . . This warranty is for 48 months or 50,000 miles, whichever occurs first . . . . Warranty repairs will be made at no charge for parts and labor.

175.    The New Vehicle Limited Warranty also specifically extends coverage to the 48-volt battery:

> BATTERY COVERAGE: Mercedes-Benz USA, LLC ("MBUSA") warrants the high voltage battery in your vehicle to the original and each subsequent owner for any repairs or replacements necessary to correct defects in material or workmanship, but not design, relating to the battery which may arise after the expiration of the Vehicle's Warranty.

176.    Plaintiffs and other Class Members could not assent to any disclaimers or limitations on this new vehicle warranty because they only received the terms of the warranty after the delivery of their vehicles.

177.    When the Defect manifested in their Vehicles, Mercedes refused to acknowledge any flaw in the electrical system, and forced Plaintiffs and Class Members to pay for repairs on their own.

178.    Mercedes knew with certainty as the time of manufacture and sale that the Defect was present in the Affected Vehicles, as it is common and uniform to every vehicle in the Class.

179.    Mercedes concealed from Plaintiffs, at the time of manufacture and sale, that the Affected Vehicles contained the Defect. Mercedes failed to inform Plaintiffs and the public of their wrongdoing, which permitted the Affected Vehicles to be re-sold at inflated prices. Mercedes' post-sale-and-delivery disclaimers and limitations on its vehicle warranties are ineffectual because such terms go to the essence of Plaintiffs' and Class Members' vehicle sale or lease contracts

34

180.     By refusing to repair the Defect, or to reimburse Plaintiffs and other Class Members for related expenses, Mercedes has failed to honor its express warranty.

## H.     Mercedes Actively Concealed and Misrepresented the Electrical Drain Defect

181.     Despite its knowledge of the Defect, Mercedes knowingly manufactured, marketed, and sold the Affected Vehicles while willfully concealing the Electrical Drain Defect from Class Members and Plaintiffs.

182.     In nationwide mass media advertising campaigns, Mercedes held out the Affected Vehicles as having superior engineering and performance, despite its knowledge that the Electrical Drain Defect represented a flaw that rendered the Affected Vehicles short of industry standards for engineering, and substantially impaired the Affected Vehicles' performance.

183.     For instance, Mercedes held out its vehicles as "technologically advanced," using "state of the art" "fine craftsmanship," which "live up to exacting requirements and relentless excellence" to deliver "unparalleled performance."

184.     In its marketing materials, Mercedes described its vehicles as ones that "overachieve, outperform, and overdeliver," and possess "extraordinary durability and longevity."

185.     In its marketing materials, Mercedes told consumers that "what you'll have a really hard time finding is anything that's been overlooked by its engineers, designers and craftspeople."

186.     Additionally, even while Mercedes continued to add new electronic features to its vehicles, and used such features to market the vehicles as premier vehicles, Mercedes never disclosed the Electric Drain Defect.

187.     Mercedes made these claims despite its knowledge of the Electrical Drain Defect.

188.     Mercedes likewise failed to notify Class Members, including Plaintiffs, of the Electrical Drain Defect prior to their purchases.

189.    Plaintiffs, along with all other Class Members, heard and saw these statements, and based their decisions to buy or lease their Affected Vehicles based on these representations and omissions.

190.    Had Mercedes disclosed the existence and extent of the Electrical Drain Defect, Plaintiffs would not have purchased their vehicles, or would have purchased them for a lower price.

191.    Mercedes also knowingly concealed the Electrical Drain Defect from Plaintiffs and other Class Members after their purchases, by telling customers who called its customer service department with complaints or concerns arising out of the Electrical Drain Defect that their vehicles had no problems, and by refusing to pay for related repairs under their warranty.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

192.    Class Members had no way of knowing about Mercedes' deception with regard to the Electrical Drain Defect in the Affected Vehicles.

193.    Within the time period of any applicable statutes of limitation, Plaintiffs and other Class Members could not have discovered through the exercise of reasonable  diligence that Mercedes was concealing the Electrical Drain Defect in the Affected Vehicles and  misrepresenting the safety, quality, and reliability of the Affected Vehicles.

194.    Plaintiffs and the other Class Members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Mercedes did not report information within their knowledge to federal and state authorities, dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Mercedes had   concealed information about the true nature of the Electrical Drain Defect in the Affected Vehicles,  which was discovered by Plaintiffs only shortly before this action was filed. Nor, in any event,  would such an

36

investigation on the part of Plaintiffs and other Class Members have revealed this information, as a result of Mercedes' concealment and misrepresentations.

195.    For these reasons, all applicable statutes of limitation have been tolled by  operation of the discovery rule with respect to the claims asserted herein.

**B.    Fraudulent Concealment Tolling**

196.    All applicable statutes of limitation have also been tolled by Mercedes' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time  period relevant to this action.

197.    Instead of disclosing the existence of the Electrical Drain Defect, Defendants falsely represented that the Affected Vehicles were safe, dependable, reliable, and of high quality.

**C.    Estoppel**

198.    Defendants were under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the electrical system in the Affected Vehicles.

199.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded  the true nature, quality, and character of the electrical system in the Affected Vehicles.

200.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CHOICE OF LAW ALLEGATIONS

201.    Because Plaintiffs bring this Complaint in New Jersey, New Jersey's choice of law regime governs the state law allegations in this Complaint. Under New Jersey's choice of law rules, New Jersey law applies to the claims of all Class Members, regardless of their state of residence or state of purchase, as Plaintiffs do not believe there is no conflict between New Jersey's law and the laws of other states with an interest in the outcome of this litigation.

202.    Because Mercedes' business in the United States was headquartered in New Jersey

for the majority of the Class Period, and all activities relevant to Plaintiffs' claims in this litigation were centered and took place in New Jersey, such as the marketing, warranting and warranty service procedures, customer service, and development and distribution of countermeasures for the Defect New Jersey law should apply to all of Mercedes' challenged actions.

## VIII.   CLASS ALLEGATIONS

203.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of a Class (the "Class), defined as follows:

> All persons who purchased or leased a Mercedes Vehicle containing the electrical drain defect rendering them subject to any remedial- or counter-measure by Mercedes, including but not limited to the following TSBs:
>
> > LI54.15-P-070802,   LI42.47-P-069817,   LI54.10-P-066344,   LI82.85-P-066086,   LI82-95-P-056655,   LI27.00-P-072627,   LI54.10-P-064762, LI54.10-P-066942, LI54.10-P-071596, or LI54.10-P-069698.

204.    In addition or as an alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure Rule 23(c)(5) and/or the respective state statute(s), Plaintiffs may seek to represent all members of the following Subclasses of the Class (the "State Subclasses"), as well as any subclasses or issue classes as Plaintiffs may propose and/or this Court may designate at the time of class certification, including but not limited to claims under the consumer protection and unfair and deceptive trade practices statutes of each of the jurisdictions below in each of those jurisdictions:

> All persons who purchased or leased, within New Jersey, California, Illinois, Minnesota, Missouri, New York, Ohio, Pennsylvania, Texas, or Virginia, a Mercedes Vehicle containing the electrical drain defect rendering them subject to any remedial- or counter-measure, including but not limited to the following TSBs:
>
> > LI54.15-P-070802,   LI42.47-P-069817,   LI54.10-P-066344,   LI82.85-P-066086,   LI82-95-P-056655,   LI27.00-P-072627,   LI54.10-P-064762, LI54.10-P-066942, LI54.10-P-071596, or LI54.10-P-069698

205.   Plaintiffs reserve their rights before the Court determines whether certification is appropriate to redefine the proposed class, or to propose subclasses, if necessary or alternatively, including but not limited to state subclasses (*i.e.*, the New Jersey Subclass, the California Subclass, etc.) and/or entity subclasses.

206.   Collectively, unless otherwise so stated, the above-defined classes and subclasses are referred to herein as the "Class."

207.   Excluded from the Classes are individuals who have personal injury claims resulting from the Electrical Drain Defect in the Affected Vehicles. Also excluded from the Classes are Defendants and their officers, executives, subsidiaries and affiliates; governmental entities; and the Judge to whom this case is assigned and their  immediate family. Plaintiffs reserve the right to revise the definition of any Class based on information learned through discovery.

208.   Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

209.   This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

210.   *Numerosity*. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiffs are informed and believe—based on publicly  available sales data for the Affected Vehicles—that there are at least hundreds of thousands of members of the Class, the precise number of Class Members is unknown to Plaintiffs but may be ascertained  from Defendants' books and records.

211.    *Commonality and Predominance*: Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class Members, including, without limitation:

a.    Whether Mercedes engaged in the conduct alleged herein;

b.    Whether Mercedes designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Affected Vehicles into the stream of commerce in the United States;

c.    Whether the Affected Vehicles contain a Defect in their electrical system;

d.    Whether the Electrical Drain Defect is a material fact that a reasonable consumer would consider in purchasing a Affected Vehicle;

e.    Whether and how long Mercedes knew or should have known about the Electrical Drain Defect of the Affected Vehicles;

f.    When Mercedes discovered the Electrical Drain Defect, and what, if anything, it did in response;

g.    The nature of uniform representations Mercedes made about the Affected Vehicles' reliability;

h.    Whether Mercedes had a duty to disclose relevant information about the Defect;

i.    Whether Mercedes concealed information about the Defect;

j.    The relevant warranties made by Mercedes relating to the Affected Vehicles, the electrical system and the Electrical Drain Defect;

k.    Whether Mercedes sought to minimize its warranty expenses by refusing to repair the Electrical Drain Defect in the Affected Vehicles;

l.     Whether Mercedes engaged in breach of contract and fraudulent concealment;

m.    Whether Plaintiffs and other Class Members overpaid for their Affected Vehicles;

n.    Whether Plaintiffs sustained out of pocket losses from repairs arising out of the Electrical Drain Defect, and if so, how much;

o.    Whether the Affected Vehicles were unfit for the ordinary purposes for which they were sold;

p.    Whether Plaintiffs and other Class Members are entitled to a declaratory judgment;

q.    Whether Plaintiffs and other Class Members are entitled to equitable relief, including a preliminary injunction;

r.    Whether Mercedes is obligated to inform Class Members of any potential claims; and

s.    Whether Plaintiffs and the other Class Members are entitled to damages and other monetary relief and, if so, in what amount.

212.    *Typicality*: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through Defendants' wrongful conduct as described above.

213.    *Adequacy*: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

214.     *Declaratory Relief*: Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the  Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

215.     *Superiority*: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no  unusual difficulties are likely to be encountered in the management of this class action. The   damages or other financial detriment suffered by Plaintiffs and the other Class Members are   relatively small compared to the burden and expense that would be required to individually  litigate their claims against Defendant, so it would be impracticable for the members of the Classes   to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford   individual litigation, such litigation creates a potential for   inconsistent or contradictory judgments and increases the delay and expense to all parties and the   court system. By contrast, a class action is suited and intended to manage such difficulties and   provide the benefits of uniform and common adjudication, economy of scale, and comprehensive supervision.

## CAUSES OF ACTION

### COUNT I
### FRAUDULENT CONCEALMENT/OMISSION
### (BASED ON COMMON LAW)
(By all Plaintiffs against Mercedes)

216.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

217.     Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

218.     Mercedes intentionally concealed that the Affected Vehicles contained the Electrical Drain Defect.

42

219.    Mercedes further affirmatively misrepresented to Plaintiffs and the public in advertising and other forms of communication, including standard and uniform material provided with each Affected Vehicle and on its website, that the Affected Vehicles it was selling had no significant defects, that the Affected Vehicles were safe, reliable, and of high quality, and would perform and operate in a safe manner.

220.    Mercedes actively concealed the Electrical Drain Defect from Plaintiffs and other Class Members while simultaneously representing that its vehicles were safe, reliable, and high-quality.

221.    Mercedes knew about the defect in the Affected Vehicles when these representations, omissions, and concealments were made.

222.    The Affected Vehicles purchased by Plaintiffs and the other Class Members contained the Electrical Drain Defect.

223.    The truth about the defective Affected Vehicles was known only to Mercedes; Plaintiffs and the other Class Members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Class Members.

224.    Plaintiffs and the other Class Members reasonably relied upon Mercedes' deception. They had no way of knowing that their vehicles contained the Electrical Drain Defect, which Mercedes concealed. As consumers, Plaintiffs and Class Members did not, and could not, unravel Mercedes' deception on their own. Rather, Mercedes intended to deceive Plaintiffs and Class Members by concealing the true facts about the Affected Vehicles and the Electrical Drain Defect.

225.    Mercedes' false representations and omissions were material to consumers because they concerned the performance of the Affected Vehicles, which played a significant role in the value of the Affected Vehicles.

226.    Mercedes had a duty to disclose the Electrical Drain Defect and violations with respect to the Affected Vehicles because they concerned the performance of the Affected Vehicles, because they relate to the safety of the vehicles and pose a safety hazard, because the details of the true facts were known and/or accessible only to Mercedes, because Plaintiffs and the other Class Members reposed trust in Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members.

227.    Mercedes also had a duty to disclose because it made general affirmative representations about the safety and reliability of the Affected Vehicles, without telling consumers that the Affected Vehicles had a fundamental Defect that would affect the safety, quality, and reliability of the Affected Vehicles.

228.    Mercedes' disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the Electrical Drain Defect as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Affected Vehicles purchased by Plaintiffs and Class Members.

229.    Mercedes has still not made full and adequate disclosures and continues to defraud Plaintiffs and Class Members by concealing material information regarding the Electrical Drain Defect in the Affected Vehicles.

230.    Plaintiffs and Class Members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or

suppressed facts, in that they would not have purchased or paid as much for the Affected Vehicles with the Electrical Drain Defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and other Class Members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class Members.

231.    Because of the concealment and/or suppression of facts, Plaintiffs and other Class Members sustained damage because they own Affected Vehicles that are diminished in value as a result of Mercedes' concealment of the true safety and quality of the Affected Vehicles. Had Plaintiffs and other Class Members been aware of the Electrical Drain Defect, and Mercedes' disregard for the truth, Plaintiffs and other Class Members would have paid less for their Affected Vehicles or would not have purchased them at all.

232.    The value of Plaintiffs' and other Class Members' Affected Vehicles has diminished as a result of Mercedes' fraudulent concealment of the Electrical Drain Defect, which has made any reasonable consumer reluctant to purchase an Affected Vehicle, let alone pay what otherwise would have been fair market value for the Affected Vehicle.

233.    Accordingly, Mercedes is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

234.    Mercedes' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights, in order to enrich Mercedes. Mercedes' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
(By all Plaintiffs against Mercedes)

235.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

236.    Plaintiffs assert this Count on behalf of themselves and all Class Members or, in the alternative, on behalf of the State Subclasses.

237.    Mercedes received and retained a benefit from the Plaintiffs and other Class Members, and inequity has resulted.

238.    Mercedes benefitted from selling and leasing the Affected Vehicles for more than they were worth as a result of Mercedes' actions, at a profit, and Plaintiffs and other Class Members have overpaid for the Affected Vehicles and been forced to pay other costs.

239.    Thus, all Plaintiffs and Class Members conferred a benefit on Mercedes.

240.    It is inequitable for Mercedes to retain these benefits.

241.    Plaintiffs and other Class Members were not aware of the true facts about the Affected Vehicles prior to purchase or lease, and did not benefit from Mercedes' conduct.

242.    Mercedes knowingly accepted the benefits of its unjust conduct. And, as a result of Mercedes' conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**COUNT III**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**(BASED ON COMMON LAW)**
(By all Plaintiffs against MBUSA only)

243.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

244.    Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

245.    Plaintiffs and other Class Members entered into contracts with MBUSA in connection with the sale of the Affected Vehicles.

246.    Plaintiffs and other Class Members gave fair and reasonable consideration and performed all their material obligations under the contracts.

247.    Implied in all contracts is a covenant of good faith and fair dealing, imposing a duty on the parties to act in good faith and deal fairly with one another.

248.    Plaintiffs and other Class Members had a reasonable expectation that, when they purchased their Affected Vehicles from MBUSA, the Affected Vehicles would be free of defects, including the Electrical Drain Defect.

249.    MBUSA used its discretion to manufacture and sell vehicles with an inferior electrical system into its vehicles without informing Plaintiffs and Class members that the inferior technology would create a safety defect in the Affected Vehicles.

250.    Plaintiffs and Class members had no reason to know MBUSA had manufactured the Affected Vehicles with an Electrical Drain Defect.

251.    By creating and promoting vehicles with the Electrical Drain Defect, MBUSA breached the covenant of good faith and fair dealing and breached its contractual duty to Plaintiffs and Class Members.

252.    As a direct and proximate result of MBUSA's breach, Plaintiffs and Class Members suffered damages, including being induced to purchase the defective Affected Vehicles.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY**
(By all Plaintiffs against MBUSA Only)

253.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

254.    Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

255.    MBUSA is a merchant with respect to the Affected Vehicles.

256.    MBUSA provided Plaintiffs and other Class Members with written warranties, expressly warranting that it would repair any defects in material free of charge during the warranty period.

257.    MBUSA's written express warranties formed the basis of the bargain reached when Plaintiffs and other Class Members purchased or leased their Affected Vehicles. Plaintiffs and Class Members reasonably relied on MBUSA's express warranties when purchasing or leasing their Affected Vehicles.

258.    MBUSA knew or should have known that its warranty was false and misleading. At the time the Affected Vehicles were sold, MBUSA knew or should have known about the existence of the Electrical Drain Defect. Nevertheless, it offered the written warranty with no intention of honoring the warranty with regard to the Electrical Drain Defect.

259.    MBUSA breached these warranties, as described in more detail above. Without limitation, the Affected Vehicles contain the Electrical Drain Defect, which causes the Affected Vehicles to malfunction or underperform. The Electrical Drain Defect is a common defect shared by all Affected Vehicles.

260.    MBUSA has not offered a permanent or adequate repair or replacement of the Electrical System that would cure the Electrical Drain Defect. MBUSA has repeatedly refused to pay the costs of repairing or replacing the electrical system, offering instead only temporary fixes.

261.    The mileage and time limits contained in MBUSA's warranty periods were also unconscionable and inadequate to protect Plaintiffs and Class Members. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these mileage and time limitations, the terms of which unreasonably favored MBUSA. A gross disparity in bargaining power existed between MBUSA and the Class Members, and MBUSA knew of the defect at the time of sale.

262.    By refusing to repair the Defect, MBUSA breached its express warranty to repair defects in the Affected Vehicles. MBUSA has not remedied its breach.

263.    Alternatively, affording MBUSA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of the sale or lease of each Affected Vehicle, MBUSA knew or should have known of its misrepresentations and omissions regarding the Electrical Drain Defect, but nonetheless failed to rectify the situation or disclose the Defect. When customers have reported problems associated with the Electrical Drain Defect, MBUSA has not covered repairs to the electrical system under its warranty. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure or afford MBUSA a reasonable opportunity to cure its breach of warranty is excused and should therefore be deemed satisfied

264.    As a direct and proximate of MBUSA's breach of its express written warranty, Plaintiffs and other Class Members have been damaged in an amount to be determined at trial.

49

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(By all Plaintiffs against MBUSA only)

265.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

266.    Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

267.    A warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased an Affected Vehicle from Defendants.

268.    The Affected Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used as a result of the Electric Drain Defect.

269.    MBUSA knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

270.    Because of the Electrical Drain Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

271.    MBUSA knew about the defect in the Affected Vehicles, allowing MBUSA to cure their breach of warranty if it chose.

272.    Plaintiffs and other Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of MBUSA's conduct described herein. Affording MBUSA a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile. Moreover, MBUSA was

provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

273.    Accordingly, MBUSA is liable to Plaintiffs and other Class Members for damages in an amount to be proven at trial.

**COUNT VI**
**VIOLATIONS OF 15 U.S.C. § 2301, *ET SEQ.***
**THE MAGNUSON-MOSS WARRANTY ACT**
(by all Plaintiffs against MBUSA only)

274.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

275.    Plaintiffs bring this cause of action for themselves and on behalf of the Class. In the alternative, Plaintiffs bring this claim on behalf of each State Subclass under the law of each state in which Class or Subclass members owned and/or leased an Affected Vehicle.

276.    Plaintiffs are each a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

277.    MBUSA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

278.    The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

279.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

280.    MBUSA provided Plaintiffs and other Class Members with a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Affected Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

281.    MBUSA breached these warranties, as described in more detail above. Without limitation, the Affected Vehicles contain the Electrical Drain Defect, which causes the Affected Vehicles to malfunction or underperform. The Electrical Drain Defect is a common design defect shared by all Affected Vehicles.

282.    At the time the Affected Vehicles were sold, MBUSA knew or should have known about the existence of the Electrical Drain Defect and offered the written warranty, with no intention of honoring the warranty with regard to the Electrical Drain Defect.

283.    MBUSA has not offered a permanent or adequate repair or replacement of the Electrical System that would cure the Electrical Drain Defect. MBUSA has repeatedly refused to pay the costs of repairing or replacing the electrical system, offering instead only temporary fixes. This refusal to adequately repair or replace a defective product violates 15 U.S.C. § 2304(d)(1).

284.    MBUSA extended an implied warranty to Plaintiffs and other Class Members, which covers the Electrical Drain Defect.

285.    MBUSA breached its implied warranty by selling Affected Vehicles with the Electrical Drain Defect, which rendered the vehicles neither merchantable nor fit for their intended purpose.

286.    Plaintiffs and the other Class Members have had sufficient direct dealings with either MBUSA or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between MBUSA on one hand, and Plaintiffs and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between MBUSA and its dealers, and specifically, of MBUSA's implied warranties. The dealers were not intended to be the ultimate consumers of the Affected Vehicles and have no rights under the warranty agreements provided

with the Affected Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

287.    MBUSA was afforded a reasonable opportunity to cure its breach but failed to do so.

288.    Alternatively, affording MBUSA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of the sale or lease of each Affected Vehicle, MBUSA knew or should have known of its misrepresentations and omissions regarding the Electrical Drain Defect, but nonetheless failed to rectify the situation or disclose the Defect. When customers have reported problems associated with the Electrical Drain Defect, MBUSA has not covered repairs to the electrical system under its warranty. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure or afford MBUSA a reasonable opportunity to cure its breach of warranty is excused and should therefore be deemed satisfied.

289.    Plaintiffs and the other Class Members would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them. Because MBUSA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class Members have not re-accepted their Affected Vehicles by retaining them.

290.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

291.   Plaintiffs, individually and on behalf of the other Class Members, seek all damages permitted by law, including diminution in value of the Affected Vehicles, in an amount to be proven at trial.

**COUNT VII**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)**
(By all Plaintiffs against Mercedes, or, alternately, by the New Jersey Subclass against Mercedes)

292.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

293.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class, or, alternatively, on behalf of the New Jersey Subclass.

294.   Mercedes, Plaintiffs, and Class Members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

295.   Mercedes engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

296.   The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("N.J. CFA"), makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

297.   Mercedes thus violated the N.J. CFA by, at minimum, (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they

are not; and (3) advertising the Affected Vehicles as safe with the intent not to sell them as advertised.

298.   Mercedes intentionally, affirmatively, and knowingly misrepresented material facts, and actively concealed and intentionally omitted material facts regarding the Electrical Drain Defect and the Affected Vehicles with intent to mislead Plaintiffs and other Class Members.

299.   Mercedes also engaged in unconscionable and deceptive conduct by selling the Affected Vehicles with the Electrical Drain Defect without disclosing it to consumers, including Plaintiffs and other Class Members, despite knowing that it would cause vehicles to malfunction and performance to suffer.

300.   Mercedes knew or should have known of the Electrical Drain Defect prior to the sale or lease of the Affected Vehicles to Plaintiffs and other Class Members.

301.   Mercedes knowingly and intentionally failed to disclose material facts regarding the Electrical Drain Defect to Plaintiffs and other Class Members.

302.   Mercedes knew or should have known that its conduct violated the N.J. CFA.

303.   Mercedes owed Plaintiffs and Class members a duty to disclose the truth about the Defect because it, possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; intentionally concealed the foregoing from Plaintiffs and Class Members, and made incomplete representations about the Affected Vehicles' safety while purposefully withholding material facts that contradicted those representations.

304.   Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiffs and Class members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

305.   Mercedes also had a duty to disclose that the Affected Vehicles were defective because the Defect creates a safety issue.

306.   Mercedes also had a duty to disclose that the Affected Vehicles were defective because Plaintiffs and the other Class Members reposed trust in Mercedes,

307.   Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity and were likely to mislead and create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiff and Subclass members

308.   Mercedes' conduct proximately caused injuries to Plaintiffs and other Class Members.

309.   Plaintiffs and other Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Mercedes' conduct in that  Plaintiffs and the other Class Members overpaid for their Affected Vehicles and did not receive  the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations, fraud, deceptive practices, and omissions.

310.   Mercedes' violations present a continuing risk to the safety of Plaintiffs as well as to the  general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

311.   Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the other Class Members actual damages in an amount to be proven at trial, statutory damages, and treble damages, as well as injunctive relief attorneys' fees and costs, and all other relief that this Court demes just and proper.

**COUNT VIII**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, ET SEQ.)**
(By the California Subclass Against Mercedes)

312.     Plaintiffs Valeriu Matei, Teresa Isom, and Linda Blackwell (for purposes of the next four counts, "Plaintiffs") restate and reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows.

313.     Plaintiffs bring this claim on behalf of themselves and the members of the California Subclass (for purposes of the next four Counts, the "Subclass").

314.     California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

315.     In the course of their business, Mercedes concealed and suppressed material facts concerning the Electrical Drain Defect. Mercedes falsely represented the quality of the Affected Vehicles and omitted material facts regarding the electrical system, as well as the durability and overall value of the Affected Vehicles, for the purpose of inducing Plaintiffs and other California Subclass members to purchase the Affected Vehicles, and to increase Mercedes' revenue and profits.

316.     The facts concealed and omitted by Mercedes were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiffs and other California Subclass members known of the Electrical Drain Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

317.     Plaintiffs and Subclass members have suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes' misrepresentations, concealment, and failure to disclose material information.

318.     Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

319.     Pursuant to CAL. BUS. & PROF. CODE § 17200, Plaintiffs and the California Subclass seek any such orders or judgments as may be necessary to restore to Plaintiffs and California Subclass members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE §§ 17203 and 3345, and any other just and proper relief available under the UCL.

**COUNT IX**
**VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**(CAL. CIV. CODE § 1750, ET SEQ.)**
(By the California Subclass Against Mercedes)

320.     Plaintiffs restate and reallege, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows.

321.     Plaintiffs bring this claim on behalf of themselves and the California Subclass.

322.     California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, et seq., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

323.     The Affected Vehicles are "goods" as defined in CAL. CIV. CODE § 1761(a).

324.     Plaintiffs and the California Subclass members are "consumers" as defined in CAL. CIV. CODE § 1761(d).

325.     Plaintiffs, the California Subclass members, and Mercedes are "persons" as defined in CAL. CIV. CODE § 1761(c).

326.     As alleged above, Mercedes made representations concerning the reliability and safety of the Affected Vehicles that were misleading.

327.    Mercedes' conduct, as described herein, was and is in violation of the CLRA and violates at least the following enumerated CLRA provisions: (1) Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;, CAL. CIV. CODE § 1770(a)(5); (2) Representing that goods are of a particular standard, quality, or grade, if they are of another, CAL. CIV. CODE § 1770(a)(5); (3) Advertising goods with intent not to sell them as advertised, CAL. CIV. CODE § 1770(a)(9); and (4) Representing that goods have been supplied in accordance with a previous representation when they have not. CAL. CIV. CODE § 1770(a)(16).

328.    In purchasing or leasing the Affected Vehicles, Plaintiffs, and California Subclass members were deceived by Mercedes' failure to disclose the Electrical Drain Defect.

329.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and California Subclass members.

330.    In purchasing or leasing the Affected Vehicles, Plaintiffs and the California Subclass members were deceived by Mercedes' failure to disclose the Defect, as described above.

331.    Plaintiffs and the California Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations. They had no way of knowing that Mercedes' representations were false and gravely misleading. Plaintiffs and the California Subclass members did not, and could not, unravel Mercedes' deception on their own.

332.    Mercedes knew or should have known that its conduct violated the CLRA.

333.    Mercedes owed Plaintiffs and the California Subclass members a duty to disclose the truth about the Defect because they possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiffs and the California Subclass members.

334.    Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiffs and the California Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

335.    Mercedes also had a duty to disclose that the Affected Vehicles were defective because the Defect creates a safety issue.

336.    Mercedes' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass members, about the safety and reliability, quality, and value of the Affected Vehicles.

337.    Plaintiffs and the California Subclass members relied on Mercedes' material omissions and representations that the Affected Vehicles they were purchasing were free from defects.

338.    Plaintiffs and the California Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Affected Vehicles, or would have paid less for them. Plaintiffs' and the California Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or the California Subclass members.

339.    Mercedes' conduct proximately caused injuries to Plaintiffs and the California Subclass members.

340.    Plaintiffs and the California Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiffs and the other Class members overpaid for their Affected Vehicles and did not

receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

341.    Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

342.    Mercedes knew, should have known, or was reckless in not knowing of the Defect in the electrical system and that the Affected Vehicles were not suitable for their intended use.

343.    The facts concealed and omitted by Mercedes from Plaintiffs and the California Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiffs and the California Subclass members known about the defective nature of the Affected Vehicles, they would not have purchased or leased the Affected Vehicles or would not have paid the prices they paid.

344.    Plaintiffs' and the California Subclass members' injuries were proximately caused by Mercedes' unlawful and deceptive business practices.

345.    Plaintiffs and the California Subclass members are entitled to recover actual and punitive damages under the CLRA pursuant to CAL. CIV. CODE § 1780(a), and an additional award of up to $5,000 to each Plaintiffs and California Subclass member who is a "senior citizen."

**COUNT X**
**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE § 17500, ET SEQ.)**
(By the California Subclass Against Mercedes)

346.    Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows.

347.    Plaintiffs bring this claim on behalf of themselves and the California Subclass.

348.    Mercedes, Plaintiffs, and Subclass members are "persons" under Cal. Bus. & Prof. Code § 17506.

349.    The California False Advertising Law ("FAL") states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." CALIFORNIA BUS. & PROF. CODE § 17500

350.    Mercedes violated the FAL because they caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Mercedes, to be untrue and misleading to consumers, including Plaintiffs and the California Subclass members.

351.    Mercedes has violated CAL. BUS. & PROF. CODE § 17500 because the misrepresentations and omissions regarding the reliability and safety of the Affected Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

352.    Plaintiffs and the California Subclass members have suffered an injury in fact, including the loss of money or property, as a result of Mercedes' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Affected Vehicles, Plaintiffs and the California Subclass members relied on the misrepresentations and/or omissions of Mercedes with respect to the reliability and safety of the Affected Vehicles.

353.    Plaintiff and the Subclass members had no way of discerning that the Mercedes' representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiffs and Subclass members did not, and could not, unravel the Mercedes' deception on their own.

354.    Mercedes owed Plaintiffs and the Subclass members a duty to disclose the truth about the Defect because they possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiffs and the Subclass members.

355.    Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiffs and the Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

356.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Mercedes' business. Mercedes' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

357.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest. Mercedes' violations present a continuing risk to Plaintiff as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest

358.    Plaintiffs, individually and on behalf of the California Subclass, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and the California Subclass members any money Mercedes acquired by unfair competition, including restitution and/or restitutionary disgorgement and for such other relief as may be appropriate.

**COUNT XI**
**VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT**
**FOR BREACH OF IMPLIED WARRANTIES**
**(CAL. CIV. CODE §§ 1791.1 AND 1792)**
(By the California Subclass against Mercedes)

359.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

360.     Plaintiffs bring this claim on behalf of themselves and the California Subclass.

361.     Plaintiffs and the California Subclass members who purchased or leased Affected Vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791.

362.     The Affected Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

363.     Defendants are "manufacturers" of the Affected Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

364.     Mercedes warranted to Plaintiffs and California Subclass members that the Affected Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) and 1792; however, the Affected Vehicles do not have the quality that a buyer would reasonably expect.

365.     CAL. CIV. CODE § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

i.     Pass without objection in the trade under the contract description.

ii.     Are fit for the ordinary purposes for which such goods are used.

iii.     Are adequately contained, packaged, and labeled.

iv.     Conform to the promises or affirmations of fact made on the container or label.

366.    The Affected Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

367.    Mercedes marketed the Affected Vehicles as safe, reliable, and high-quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiffs' and California Subclass members' decisions to purchase the Affected Vehicles.

368.    Plaintiffs and other California Subclass members purchased the Affected Vehicles from Mercedes, or through Mercedes' authorized agents for retail sales. At all relevant times, Mercedes was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

369.    Mercedes knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

370.    Because of the Electrical Drain Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

371.    Mercedes knew about the Defect in the Affected Vehicles, allowing Mercedes to cure their breach of warranty if it chose to do so.

372.    Mercedes' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Mercedes' warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the Defect. The time and distance limitations contained in Mercedes' warranty periods were also unconscionable and inadequate to protect Plaintiffs and other California Subclass members. Among other things, Plaintiffs and other California Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored

Mercedes. A gross disparity in bargaining power existed between Mercedes and California Subclass members, and Mercedes knew of the Defect at the time of sale.

373.    Plaintiffs and California Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Mercedes' conduct described herein. Affording Mercedes a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

374.    Mercedes was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

375.    Accordingly, Mercedes is liable to Plaintiffs and California Subclass members for damages in an amount to be proven at trial.

376.    Under CAL. CIV. CODE §§ 1791.1(d) and 1794, Plaintiffs and the California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Affected Vehicles, or the overpayment or diminution in value of their Affected Vehicles.

377.    Under CAL. CIV. CODE § 1794, Plaintiffs and the California Subclass members are entitled to costs and attorneys' fees.

**COUNT XII**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD**
**AND DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILL. COMP. STAT. 505/1 ET. SEQ.)**
(By the Illinois Subclass against Mercedes)

378.    Plaintiff Kia Watson (for purposes of this Count, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

379.    Plaintiff brings this Count on behalf of the members of the Illinois Subclass (for purposes of this Count, the "Subclass").

380.    Defendants are each a "person" as that term is defined in 815 Ill. Comp. Stat. 505/1(c).

381.    Plaintiff and the Subclass members are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

382.    The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. 505/2.

383.    In the course of their business, Mercedes violated the Illinois CFA by failing to disclose and actively concealing the Electrical Drain Defect in the Affected Vehicles, by marketing the Affected Vehicles as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers.

384.    The facts concealed and omitted by Mercedes were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other Illinois Subclass members known of the Electrical Drain Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

385.    Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity and were likely to mislead and create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiff and Subclass members.

386.     Mercedes' conduct proximately caused injuries to Plaintiff and the other Illinois Subclass members.

387.     Plaintiff and the Subclass members had no way of discerning that the Mercedes' representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiffs and Illinois Subclass members did not, and could not, unravel Mercedes' deception on their own.

388.     Mercedes owed Plaintiffs and the Subclass members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiffs and the Subclass members.

389.     Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiffs and the Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

390.     Plaintiff and the other Illinois Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of Mercedes' conduct in that Plaintiff and the other Illinois Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations, fraud, deceptive practices, and omissions.

391.     Mercedes' violations present a continuing risk to Plaintiff as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest. Mercedes' violations present a continuing risk to Plaintiff as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

392.     Pursuant to 815 Ill. Comp. Stat. 505/10a(a), Plaintiff and the Class members seek monetary relief against Mercedes in the amount of actual damages, as well as punitive damages because Mercedes acted with fraud and/or malice and/or was grossly negligent.

**COUNT XIII**
**VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**(MINN. STAT. § 325F.68 *ET SEQ.*)**
(By the Minnesota Subclass against Mercedes)

393.     Plaintiff Muhammed Jackson (for purposes of the next two Counts, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

394.     Plaintiff brings this Count on behalf of the members of the Minnesota Subclass (for purposes of the next two Counts, the "Subclass").

395.     The Affected Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

396.     The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69.

397.     In the course of their business, Mercedes concealed and suppressed material facts concerning the Electrical Drain Defect. Defendants falsely represented the quality of the Affected Vehicles and omitted material facts regarding the electrical system, as well as the durability and overall value of the Affected Vehicles, for the purpose of inducing Plaintiff and other Minnesota Subclass members to purchase the Affected Vehicles, and to increase Mercedes' revenue and profits.

69

398.    Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity and were likely to mislead and create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiff and Subclass members.

399.    The facts concealed and omitted by Mercedes were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other Minnesota Subclass members known of the Electrical Drain Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

400.    Mercedes and the Subclass members had no way of discerning that the Mercedes' representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

401.    Mercedes owed Plaintiff and the Subclass members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiff and the Minnesota Subclass.

402.    Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiff and the Minnesota Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

403.    Mercedes also had a duty to disclose that the Affected Vehicles were defective because the Defect creates a safety issue.

404.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

405.     Plaintiff and the Minnesota Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damages as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

406.     Plaintiff and the Subclass suffered injury in fact and actual damages as a direct and proximate result of Mercedes' violations of the Minnesota CFA.

407.     Pursuant to Minn. Stat. § 8.31(3a), Plaintiff and Minnesota Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

408.     Plaintiff also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Mercedes' acts show deliberate disregard for the rights of others.

## COUNT XIV
## VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (MINN. STAT. § 325D.43-48 *ET SEQ.*)
(By the Minnesota Subclass against Mercedes)

409.     Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

410.     The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" or "advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

411.    In the course of its business, Mercedes engaged in deceptive practices by representing that the Affected Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; representing that Affected Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Affected Vehicles with intent not to sell them as advertised. Mercedes participated in misleading, false, or deceptive acts that violated the Minnesota DTPA.

420.    These actions occurred in the conduct of trade or commerce.

421.    Mercedes' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the safety and reliability, quality, and value of the Affected Vehicles.

422.    The facts concealed and omitted by Mercedes were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other Minnesota Subclass members known of the Electrical Drain Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

423.    Plaintiff and the Subclass members had no way of discerning that the Mercedes' representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiff and Subclass members did not, and could not, unravel the Mercedes' deception on their own.

424.    Mercedes owed Plaintiff and Subclass members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which

possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiffs and the Minnesota Subclass.

425.    Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiff and the Minnesota Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

426.    Mercedes also had a duty to disclose that the Affected Vehicles were defective because the Defect creates a safety issue.

427.    Plaintiff and Subclass members have suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes' misrepresentations, concealment, and failure to disclose material information

428.    Pursuant to Minn. Stat. §§ 8.31(3a) and 325D.45, Plaintiff and the Minnesota Subclass seek actual damages, attorneys' fees, and any other relief that this Court deems just and proper.

### COUNT XV
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### (MO. ANN. STAT. § 407.010 *ET SEQ.*)
(By the Missouri Subclass against Mercedes)

429.    Plaintiff Levanda Gayden (for purposes of this Count, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

430.    Plaintiff brings this Count on behalf of the members of the Missouri Subclass (for the purposes of this Count, the "Subclass").

431.    The Affected Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

432.    Plaintiff, the Missouri Subclass members, and Defendants are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

433.    Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

434.    The Missouri Merchandising Practices Act ("MMPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of ay material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.010(7).

435.    In the course of their business, Mercedes willfully failed to disclose and actively concealed the problems and risks posed by the Electrical Drain Defect. Mercedes compounded the deception by repeatedly assuring Plaintiff and other Subclass Members and the Affected Vehicles were safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Subclass members' decisions to purchase the Affected Vehicles.

436.    By failing to disclose and actively concealing the Electrical Drain Defect in the Affected Vehicles, by marketing the Affected Vehicles as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers, Mercedes engaged in unfair or deceptive business practices in violation of the Missouri MPA.

437.    Mercedes intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiff and Subclass members, including without limitation by failing to disclose the Electrical Drain Defect in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences, or representations made by Mercedes about the safety and reliability of the Affected Vehicles. Consequently, the failure to disclose such facts amounts to misleading statements under 15 Mo. Code of Serv. Reg. §60-9.090.

74

438.    Because Mercedes knew or believed that their statements regarding the safety and reliability of the Affected Vehicles were false and/or had no reasonable basis for such statements in light of their knowledge of the Defect, Mercedes engaged in fraudulent misrepresentations under 15 Mo. Code of Serv. Reg.60-9.100.

439.    Mercedes' conduct is unethical, oppressive, or unscrupulous and/or presented a risk of substantial injury to consumers whose vehicles were inherently defective and dangerous as a result of the Electrical Drain Defect. This conduct amounts to unfair practices under 15 Mo. Code of Serv. Reg. 60-8.020.

440.    By failing to disclose the Electrical Drain Defect, which was or should have been known to Mercedes upon a reasonable inquiry, Mercedes deprived consumers of all material facts about the safety and functionality of the Affected Vehicles. By failing to release material facts about the Defect, Mercedes curtailed the ability of consumers to take notice of material facts about their vehicles, and/or affirmatively operated to hide or keep those facts from consumers.

441.    Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity and were likely to mislead and create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiff and Subclass members.

442.    Mercedes knew about the Electrical Drain Defect before the sale of the Affected Vehicles, but nevertheless failed to disclose an actively concealed the presence and consequences of the Defect, in order to ensure that Plaintiffs and Subclass Members would purchase the Affected Vehicles.

443.    Mercedes knew or should have known that their conduct violated the Missouri MPA.

75

444.    Mercedes owed Plaintiff and the Subclass members a duty to disclose the truth about the Defect , because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiff and the Subclass members.

445.    Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiff and the Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

446.    Mercedes also had a duty to disclose that the Affected Vehicles were defective because the Defect creates a safety issue.

447.    Plaintiff and the Subclass members relied on Mercedes' material omissions and representations that the Affected Vehicles they were purchasing were free from defects.

448.    Plaintiff and the Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Affected Vehicles, or would have paid less for them. Plaintiff's and the Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or the Subclass members.

449.    Mercedes' conduct proximately caused injuries to Plaintiff and the Subclass members.

450.    Plaintiff and the Missouri Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damages as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution

in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

451.     Mercedes' violations present a continuing risk to Plaintiff, the Subclass, and the general public. Mercedes' unlawful facts and practices complained of herein affect the public interest.

452.     Defendants are liable to Plaintiff and the Missouri Subclass for damages in an amount to be proven at trial, attorneys' fees, costs, punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, as well as any other relief that this Court finds just and proper.

**COUNT XVI**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. GEN. BUS. LAW § 349)**
(By the New York Subclass against Mercedes)

453.     Plaintiff Siro Brenes (for purposes of the next two counts, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

454.     Plaintiff brings this Count on behalf of the members of the New York Subclass (for purposes of the next two counts, the "Subclass").

455.     Plaintiff is a "person" within the meaning of New York General Business Law ("New York DAPA"). N.Y. Gen. Bus. Law § 349(h).

456.     Defendants are each a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

457.     New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Mercedes' conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York DAPA. All of Mercedes' deceptive acts or practices, which were

intended to mislead consumers in a material way in the process of purchasing or leasing Affected Vehicles, was conduct directed at consumers and "consumer-oriented." Further, Plaintiff and other Class members suffered injury as a result of the deceptive act or practice.

458.    In the course of its business, Mercedes concealed and suppressed material facts concerning the Electrical Drain Defect. Mercedes falsely represented the quality of the Affected Vehicles and omitted material facts regarding the Defect, as well as the durability and overall value of the Affected Vehicles, for the purpose of inducing Plaintiff and other New York Subclass members to purchase the Affected Vehicles, and to increase Mercedes' revenue and profits.

459.    Mercedes thus violated the New York DAPA by, at minimum, (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; and (3) representing that the subject of a transaction involving the Affected Vehicles has been supplied in accordance with a previous representation when it has not

460.    The facts concealed and omitted by Mercedes were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other New York Subclass members known of the Electrical Drain Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

461.    Mercedes' concealment of the Defect was material to Plaintiff's and the Subclass members' decision to purchase or lease the Affected Vehicles

462.    Mercedes intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with the intent to mislead Plaintiff and the Subclass.

463.    Mercedes knew or should have known that its conduct violated the NY DAPA.

464.    Mercedes owed Plaintiff and the Subclass members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiff and the New York Subclass.

465.    Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiff and the New York Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

466.    Mercedes also had a duty to disclose that the Affected Vehicles were defective because the Defect creates a safety issues.

467.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Affected Vehicles and did not get the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations, fraud, deceptive practices, and omissions.

468.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Mercedes' deceptive practices are in the hundreds of thousands nation-wide; (2) Mercedes has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Affected Vehicles to Plaintiff and individual Class members; and (3) so long as the Affected Vehicles continued to be sold and distributed, the likelihood of continued impact on other consumers is significant.

469.     As a direct and proximate consequence of Mercedes' violations, Plaintiff and the Subclass have suffered injury in fact and actual damages.

470.     Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the Subclass seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Mercedes' willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Subclass members also seek attorneys' fees, an order enjoining Mercedes' deceptive conduct, and any other just and proper relief available under the New York GBL.

**COUNT XVII**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. GEN. BUS. LAW § 350)**
(By the New York Subclass against Mercedes)

471.     Plaintiff incorporates by reference all paragraphs as though fully set forth herein. Plaintiff brings this Count on behalf of the New York Subclass.

472.     Mercedes was engaged in the "conduct of business, trade or commerce" within the meaning of the New York's General Business Law § 350.

473.     New York's General Business Law § 350, the New York False Advertising Act ("New York FAA") makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

474.     Mercedes caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Mercedes, to be untrue and misleading to consumers, including Plaintiff and other Subclass members.

475.    Mercedes has violated N.Y. Gen. Bus. Law § 350 because of the misrepresentations and omissions alleged herein, including, but not limited to, Mercedes' failure to disclose the Electrical Drain Defect in the Affected Vehicles such that the batteries in the Affected Vehicles suddenly and rapidly drain, preventing the Affected Vehicles from starting and/or causing performance to dramatically suffer.

476.    In the course of its business, Mercedes concealed and suppressed material facts concerning the Electrical Drain Defect. Mercedes falsely represented the quality of the Affected Vehicles and omitted material facts regarding the electrical system, as well as the durability and overall value of the Affected Vehicles, for the purpose of inducing Plaintiff and other New York Subclass members to purchase the Affected Vehicles, and to increase Mercedes' revenue and profits.

477.    Mercedes' false advertising had a tendency or capacity and were likely to mislead and create a false impression in regulators and reasonable consumers, and did in fact deceive regulators and reasonable consumers, including Plaintiff and Subclass members.

478.    The facts concealed and omitted by Mercedes were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other New York Subclass members known of the Electrical Drain Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

479.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of Mercedes' conduct in that Plaintiff and the other Class members overpaid for their Affected Vehicles and did not get the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These

injuries are the direct and natural consequence of Mercedes' misrepresentations, fraud, deceptive practices, and omissions.

480.    Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass Members.

481.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Affected Vehicles and did not get the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations, fraud, deceptive practices, and omissions.

482.    Plaintiff and the Subclass seek to recover their actual damages or $500, whichever is greater. Because Mercedes acted willfully or knowingly, Plaintiff and other Subclass members are entitled to recover three times actual damages, up to $10,000. The Subclass also seeks an order enjoining Mercedes' false advertising, attorneys' fees, and other relief that this Court deems just and appropriate.

## COUNT XVIII
## VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (THE "OHIO CSPA")
## (OHIO REV. CODE § 1345.01 *ET SEQ.*)
(By the Ohio Subclass against Mercedes)

483.    Plaintiff Carl Clark (for purposes of the next two Counts, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

484.    Plaintiff brings this Count on behalf of the members of the Ohio Subclass (for purposes of the next two counts, the "Subclass").

485.    Defendants, Plaintiff, and Ohio Subclass members are "persons" under Ohio Rev. Code § 1345.01(B).

486.    Each Defendant is a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

487.    Plaintiff and the Subclass Members are "consumers" under Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Affected Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

488.    Ohio Rev. Code § 1345.02 prohibits unfair or deceptive acts or practices in connection with a consumer transaction.

489.    In the course of their business, Mercedes concealed and suppressed material facts concerning the Affected Vehicles and the Electrical Drain Defect, as described above. Specifically, Mercedes misrepresented the Affected Vehicles as safe and reliable and failed to disclose and actively concealed the Electrical Drain Defect.

490.    Mercedes thus violated the Ohio CSPA by, at minimum, (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; and (3) representing that the subject of a transaction involving the Affected Vehicles has been supplied in accordance with a previous representation when it has not. Ohio Rev. Code § 1345.02(A), (B)(1), (2), and (4).

491.    Mercedes intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Ohio Subclass.

492.    Mercedes knew or should have known that their conduct violated the Ohio CSPA.

493.    Plaintiff and the Subclass members had no way of discerning that the Mercedes' representations were false and misleading and/or otherwise learning the facts that the Mercedes

had concealed or failed to disclose. Plaintiff and Subclass members did not, and could not, unravel the Mercedes' deception on their own.

494.    Mercedes owed Plaintiff and the Subclass members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiff and the Ohio Subclass.

495.    Mercedes had a duty to disclose that the Affected Vehicles were defective, because, having volunteered to provide information to Plaintiff and the Ohio Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

496.    Mercedes also had a duty to disclose that the Affected Vehicles were defective because the Defect creates a safety issue.

497.    Mercedes' concealment of the Defect was material to Plaintiff's and the Subclass members' decision to purchase or lease the Affected Vehicles.

498.    Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity and were likely to mislead and create a false impression in regulators and consumers, and did in fact deceive regulators and reasonable consumers, including Plaintiff and Subclass members.

499.    Mercedes' violations present a continuing risk to Plaintiff and the Ohio Subclass, as well as the general public. Mercedes' unlawful acts and practices complained of here affect the public interest.

500.    Plaintiff and the Ohio Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes' misrepresentations, concealment, and failure to disclose material information.

501.     Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and the Ohio Subclass members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages, treble damages, and attorneys' fees, costs, and any other just and proper relief under the Ohio CSPA.

## COUNT XIX
## VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT
## (OHIO REV. CODE § 4165.01 *ET SEQ.*)
(By the Ohio Subclass against Mercedes)

502.     Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

503.     Plaintiff brings this Count on behalf of the Ohio Subclass.

504.     Defendants, Plaintiff, and Ohio Subclass members are "persons" under Ohio Rev. Code § 4165.01(D).

505.     Defendants engaged in "the course of [their] business" within the meaning of Ohio Rev. Code § 4165.02(A) with respect to the acts alleged herein.

506.     The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio DTPA") prohibits deceptive trade practices.

507.     In the course of their business, Defendants concealed and suppressed material facts concerning the Affected Vehicles and the Electrical Drain Defect, as described above. Specifically, Mercedes misrepresented the Affected Vehicles as safe and reliable and failed to disclose and actively concealed the Electrical Drain Defect.

508.     Mercedes thus violated the Ohio DTPA by, at minimum, (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Affected Vehicles as safe with the intent not to sell them as advertised. Ohio Rev. Code § 4165.02(A)(7), (9), and (11).

85

509.    Mercedes intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Ohio Subclass.

510.    Mercedes knew or should have known that their conduct violated the Ohio DTPA.

511.    Plaintiff and the Subclass members had no way of discerning that the Mercedes' representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiff and Ohio Subclass members did not, and could not, unravel Mercedes' deception on their own.

512.    Mercedes owed Plaintiff and the Subclass members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; and intentionally concealed the foregoing from regulators, Plaintiff and the Ohio Subclass members; and/or made incomplete representations about the Affected Vehicles' electrical systems while purposefully withholding material facts that contradicted these representations.

513.    Mercedes' concealment of the Defect was material to Plaintiff's and Subclass members' decision to purchase or lease the Affected Vehicles.

514.    Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity and were likely to mislead and create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiff and Subclass members.

515.    Mercedes' violations present a continuing risk to Plaintiff and the Ohio Subclass, as well as the general public. Mercedes' unlawful acts and practices complained of here affect the public interest.

516.     Plaintiff and the Ohio Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes' misrepresentations, concealment, and failure to disclose material information. Mercedes had an ongoing duty to refrain from unfair and deceptive practices under the Ohio DTPA. All owners of Affected Vehicles suffered ascertainable loss as a result of Mercedes' deceptive and unfair acts and practice made in the course of their business.

517.     Pursuant to Ohio Rev. Code § 4165.03, Plaintiff and the Ohio Subclass seek an order enjoining Defendants' unfair and deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Ohio DTPA.

### COUNT XX
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1 *ET SEQ.*
(By the Pennsylvania Subclass against Mercedes)

518.     Plaintiff Andrea Geoly (for purposes of this Count, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

519.     Plaintiff brings this Count on behalf of herself and the members of the Pennsylvania Subclass (for purposes of this Count, the "Subclass").

520.     Plaintiff, the Subclass Members, and Defendants are "persons" under 73 P.S. § 201-2(2).

521.     Mercedes engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

522.     The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3.

523.     In the course of their business, Mercedes violated the Pennsylvania UTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

material facts regarding the reliability, safety, and performance of the Affected Vehicles, as detailed above.

524.    Specifically, Mercedes misrepresented the Affected Vehicles as safe and reliable and failed to disclose and actively concealed the Electrical Drain Defect.

525.    Mercedes thus violated the Pennsylvania UTPA by, at minimum, (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Vehicles with the intent not to sell or lease them as advertised; and (4) engaging in any further fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

526.    Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity and were likely to mislead and create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiff and Subclass Members.

527.    Mercedes' concealment of the Defect was material to Plaintiff's and Subclass members' decision to purchase or lease the Affected Vehicles.

528.    Plaintiff and the Subclass members had no way of discerning that the Mercedes' representations were false and misleading and/or otherwise learning the facts that Mercedes had concealed or failed to disclose. Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

529.    Mercedes owed Plaintiff and the Subclass members a duty to disclose the truth about the Defect because they possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; failed to disclose all material facts regarding the Defect,

intentionally concealed the Defect from Plaintiff and Subclass Members, and/or made misrepresentations that were misleading because they were contradicted by the withheld facts.

530.    Mercedes' violations present a continuing risk to Plaintiff and the Pennsylvania Subclass, as well as the general public. Mercedes' unlawful acts and practices complained of here affect the public interest.

531.    Plaintiff and the Pennsylvania Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes' misrepresentations, concealment, and failure to disclose material information.

532.    Pursuant to 73 P.S. § 201-9.2(a), Plaintiff and the Pennsylvania Subclass seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

## COUNT XXI
## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT
## TEX. BUS. AND COMM. CODE §§ 17.41 *ET SEQ.*
(By the Texas Subclass against Mercedes)

533.    Plaintiff Keith Colwell (for purposes of this Count, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

534.    Plaintiff brings this claim on behalf of himself and the members of the Texas Subclass (for the purposes of this Count, the "Subclass").

535.    Plaintiff and the Texas State Class are "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4); Tex. Bus. & Com. Code § 17.41.

536.    Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

537.    Mercedes engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Tex. Bus. & Com. Code § 17.46(a).

538.    The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

539.    In the course of their business, Mercedes concealed and suppressed material facts concerning the Affected Vehicles, as described above.

540.    Specifically, Mercedes misrepresented the Affected Vehicles as safe and reliable and failed to disclose and actively concealed the Electrical Drain Defect.

541.    Mercedes thus violated the Texas DTPA by, at minimum, (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Affected Vehicles with the intent not to sell or lease them as advertised. Tex. Bus. & Com. Code Ann. §§ 17.46(5), (7), and (9).

542.    Mercedes intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Texas Subclass.

543.    Mercedes knew or should have known that their conduct violated the Texas DTPA.

544.    Plaintiff and the Subclass members had no way of discerning that Mercedes' representations were false and misleading and/or otherwise learning the facts that the Mercedes

had concealed or failed to disclose. Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

545.    Mercedes owed Plaintiff and the Subclass members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; failed to disclose all material facts regarding the Defect, intentionally concealed the Defect from Plaintiff and Subclass Members, and/or made misrepresentations that were misleading because they were contradicted by the withheld facts.

546.    Mercedes' concealment of the Defect was material to Plaintiff'' and Subclass members' decision to purchase or lease the Affected Vehicles.

547.    Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Texas Subclass, about the quality and safety of the Affected Vehicles.

548.    Mercedes' violations present a continuing risk to Plaintiff and the Texas Subclass, as well as the general public. Mercedes' unlawful acts and practices complained of here affect the public interest.

549.    Plaintiff and the Texas Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes' misrepresentations, concealment, and failure to disclose material information.

550.    Pursuant to Tex. Bus. & Com. Code Ann. § 17.505, Mercedes had notice of these issues through numerous public NHTSA complaints and individual lawsuits, as well as a letter sent by Plaintiff providing notice of the issues raised in this Complaint sent on September 9, 2022.

551.     Pursuant to Tex. Bus. & Com. Code § 17.50, the Texas Subclass seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

## COUNT XXII
## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
## VA. CODE ANN. §§ 59.1-196, *ET SEQ.*
### (By the Virginia Subclass against Mercedes)

552.     Plaintiff Krishnakant Khetan (for purposes of this Count, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

553.     Plaintiff brings this Count on behalf of himself and the members of the Texas Subclass (for purposes of this Count, the "Subclass").

554.     Defendants are "person[s]" under Va. Code Ann. § 59.1-198.

555.     Mercedes engaged in "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

556.     The Virginia Consumer Protection Act ("Virginia CPA") prohibits "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; [m]isrepresenting that goods or services are of a particular standard, quality, grade, style, or model; [a]dvertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction". Va. Code Ann. § 59.1-200 at (A)(5), (6), (8), and (14).

557.     In the course of their business, Mercedes concealed and suppressed material facts concerning the Affected Vehicles, as described above.

558.   Specifically, Mercedes misrepresented the Affected Vehicles as safe and reliable and failed to disclose and actively concealed the Electrical Drain Defect.

559.   Mercedes thus violated the Virginia CPA by, at minimum, (1) misrepresenting that the Affected Vehicles have quantities, characteristics, ingredients, uses, or benefits, when they did not; (2) misrepresenting that the Affected Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Affected Vehicles with the intent not to sell or lease them as advertised. Tex. Bus. & Com. Code Ann. §§ 17.46(5), (7), and (9).

560.   Mercedes intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Virginia Subclass.

561.   Mercedes knew or should have known that their conduct violated the Virginia CPA.

562.   Plaintiff and the Subclass members had no way of discerning that Mercedes' representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

563.   Mercedes owed Plaintiff and the Subclass members a duty to disclose the truth about the Defect because they possessed exclusive knowledge about the electrical systems in the Affected Vehicles, including the Defect; failed to disclose all material facts regarding the Defect, intentionally concealed the Defect from Plaintiff and Subclass Members, and/or made misrepresentations that were misleading because they were contradicted by the withheld facts.

564.   Mercedes' concealment of the Defect was material to Plaintiff's and Subclass members' decision to purchase or lease the Affected Vehicles.

565.   Mercedes' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, were likely to and did in fact deceive regulators and

reasonable consumers, including Plaintiff and the Virginia Subclass, about the quality and safety of the Affected Vehicles.

566.    Mercedes' violations present a continuing risk to Plaintiff and the Virginia Subclass, as well as the general public. Mercedes' unlawful acts and practices complained of here affect the public interest.

567.    Plaintiff and the Virginia Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes' misrepresentations, concealment, and failure to disclose material information.

568.    Pursuant to VA. Code Ann. § 59.1-204, Plaintiff and the Virginia Subclass seeks monetary relief against Mercedes measures as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Subclass member. Because Mercedes' conduct was committed willfully, Plaintiff and the Subclass are entitled to recover, for each Plaintiff and each Subclass member, the greater of treble damages or $1,000.

569.    Plaintiff and the Subclass also seek punitive damages, attorneys' fees, and any other just and proper relief under VA. Code Ann. § 59.1-204, *et seq.*

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Subclasses, respectfully request that the Court enter judgment in their favor and against Mercedes, as follows:

A.    Certification of the proposed Nationwide Class and State Subclasses, with Plaintiffs as class representatives;

B.      Appointment of Plaintiffs' counsel as Class Counsel;

C.      A declaratory judgment that the Electrical Systems in the Affected Vehicles have a Defect that results in battery drains and Electrical System Failures, and which requires disclosure.

D.      Injunctive relief, including but not limited to:

      a.   Requiring Mercedes to treat problems arising from the Electrical Drain Defect under the warranty;

      b.   Requiring Mercedes to reassess all prior warranty claims related to the Electrical Drain Defect;

      c.   Requiring Mercedes to pay the cost of inspection to determine whether the Electrical Drain Defect is present in the vehicles of Class Members, with any coverage disputes adjudicated by a special master;

      d.   Enjoining Mercedes from any further deceptive practices regarding the distribution, sale, and leasing of Affected Vehicles; and

      e.   Enjoining Mercedes from further manufacturing and selling vehicles with the Electrical Drain Defect;

B.      Restitution, including at the election of Class Members, recovery of the purchase price of their Affected Vehicles, or the overpayment or diminution in value of their Affected Vehicles;

C.      Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

D.      An order requiring Mercedes to pay both pre- and post-judgment interest on any amounts awarded;

E.       An award of costs and attorneys' fees; and

F.       Such other or further relief as may be appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated:  April 11, 2023               Respectfully submitted,

*/s/ Christopher A. Seeger*

Christopher A. Seeger
Christopher Ayers
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-1000
cseeger@seegerweiss.com
cayers@seegerweiss.com

Scott A. George
**SEEGER WEISS LLP**
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
(215) 564-2300
sgeorge@seegerweiss.com

James E. Cecchi
Caroline Bartlett
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C**.
5 Becker Farm Road
Roseland, New Jersey 07068
 (973) 994-1700
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com

Charles J. LaDuca
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
(202) 789-3960
claduca@cuneolaw.com

Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
Two CityPlace Drive, 2nd Floor
St. Louis, MO 63141
(314) 226-1015
mflannery@cuneolaw.com

Lawrence J. Friscia, III
**FRISCIA & ASSOCIATES, LLC**
199 Wilson Avenue, Suite A
Newark, New Jersey 07105
(973) 500-8024

Gary K. Burger
**BURGER LAW FIRM, LLC**
500 N. Broadway, Suite 1860
St. Louis, MO 63102
(314) 542-2222

Marybeth Putnick
Bryan F. Aylstock (pro hac vice to be submitted)
E. Samuel Geisler (pro hac vice to be submitted)
Caitlyn C. Miller (pro hac vice to be submitted)
**AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC**
17 East Main Street, Suite 200
Pensacola, FL 32502-5998
 (850) 202-1010
mptnick@awkolaw.com
baylstock@awkolaw.com
sgeisler@awkolaw.com
cmiller@awkolaw.com

*Counsel for Plaintiffs and the Proposed Class*